## LINCOLN *v.* UNITED STATES.

## WARNER, BARNES AND COMPANY, LIMITED, *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

APPEAL FROM THE COURT OF CLAIMS.

Nos. 149, 466.   Argued March 3, 1905.—Decided April 3, 1905.

The order of the President of July 12, 1898, directing the levying of duties on goods landed in the Philippine Islands, was a regulation for and during the then existing war with Spain, referred to as definitely as if it had been named, and was not a power for any other military occasion. The right to levy duties thereunder on goods brought from the United States ceased on the termination of the war by the exchange of ratifications of the treaty of peace with Spain on April 11, 1899. *Dooley* v. *United States*, 182 U. S. 222.

After the title to the Philippine Islands passed to the United States by the exchange of ratifications of the treaty of peace, there was nothing in the Philippine insurrection of sufficient gravity to give to the islands the character of foreign countries within the meaning of a tariff act. *Fourteen Diamond Rings*, 183 U. S. 176.

Under the act of Congress of July 1, 1902, 32 Stat. 691, ratifying the action of the President and the authorities of the government of the Philippine

Islands, the ratification is confined to those acts which were in accordance with the provisions of the order of July 12, 1898, and not to the collection of duties after April 11, 1899, which were within such provisions.

THE facts are stated in the opinion.

*Mr. Henry M. Ward, Mr. Frederic R. Coudert* and *Mr. Paul Fuller* for plaintiffs in error in No. 149 and appellant in No. 466:

The facts stated in the answer of the United States which was demurred to are not admitted by the demurrer and the facts found by the court are not binding, where such facts are contrary to facts publicly known, of which this court takes judicial notice. *Jones* v. *United States,* 137 U. S. 215; *The Three Friends,* 166 U. S. 63; *Underhill* v. *Hernandez,* 168 U. S. 253.

After the ratification of the treaty of cession the Philippines ceased to be hostile territory. The possession and sovereignty of the United States was complete. *DeLima* v. *Bidwell,* 180 U. S. 1; *Dooley* v. *United States,* 182 U. S. 222; *Fourteen Diamond Rings,* 183 U. S. 176.

The power of the President as Commander in Chief to levy duties on goods coming into the Philippines ceased with the ratification of the treaty.

The language of the President's order of July 12, 1898, did not authorize the collection of duties in the Insular possessions after the ratification of the treaty. *Dooley* v. *United States,* 182 U. S. 235.

The situation of affairs in the Philippines is not assimilated to the condition of the insurrectionary States during the War of the Rebellion. The territory of those States was held in possession by an organized hostile and belligerent power, while the insurrection in Manila never took on the proportions of a territorial war and the insurgents never became formidable enough to be recognized as belligerents. *The Prize Cases,* 2 Black, 673; *Coleman* v. *Tennessee,* 97 U. S. 517; Birkhimer on Military Government & Martial Law, 53; *United States* v. *Rice,* 4 Wheat. 246, 254; *United States* v. *Heywood,* 26 Fed. Cas. No. 15,336, p. 246.

There is a clear distinction between the suppression of a political revolt by force of arms—which was the situation in the Philippines, and hostilities with a *de facto* belligerent power, recognized as such,—which was the situation during the Rebellion. *The Three Friends,* 166 U. S. 1.

The operation of the treaty of peace was not suspended or superseded by military law on account of the insurrection in the Philippines. The sovereignty of the United States Government in the Islands was established and the treaty was effective. The Government was simply preserving order and suppressing insurrection in its own territory. Proclamation of Gen. McArthur, Dec. 20, 1900; War Dept. Report, June 30, 1901; President's Order, December, 1899, pp. 44–52; Report of Sec. of War, 1899, pp. 6–12.

The act of Congress, July 1, 1902, 32 Stat. 692, is not a ratification of the collection of duties under military order after ratification of the treaty. The order has been so construed in *Dooley* v. *United States,* 182 U. S. 236.

A reënactment by Congress of a former statute already judicially construed is presumed to conform to and adopt the judicial construction of the former act. *Dorr* v. *United States,* 195 U. S. 138. Any ratification of Congress is inoperative to divest claimants of their vested right to recover moneys illegally collected of them. *De Lima* v. *Bidwell,* 182 U. S. 199.

By leave of the court *Mr. Hilary A. Herbert* and *Mr. Benjamin Micou* filed a brief on behalf of certain claimants in suits pending in the Court of Claims and whose interests are similar to those of appellants in No. 466.

The *Solicitor General* for the United States:

The situation in the Philippines was not ordinary revolt or mere insurrection; it was settled and serious rebellion. It was civil war so far as extent and duration are concerned. For the distinctions see section 10, Lieber's Instructions for the Government of Armies in the Field; *The Prize Cases,* 2 Black,

635, 666. It is of no consequence that at one time the warfare seemed to be dying out. It was soon renewed, and after defeat in many open engagements, the *insurrectos* systematized guerilla warfare. Although reports and messages of the Executive during the war show encouragement and satisfaction at the progress of our arms and the gradual extension of civil government, it is certain that the Executive, and Congress as well, before the later authorizing and ratifying statutes, determined that war existed. A state of war prevailed and the exercise of the war power was necessary.

The power of an executive government in the field is absolute. It may totally forbid all commercial intercourse, or restrict it. It may exact military contributions as indemnity and to defray current expenses. Such charges are devoted to military needs and civil administration of the country. The Executive may exact conditions for trading with hostile territory. Importation under such circumstances is not a right but a privilege to be exercised solely upon the conditions imposed. These doctrines apply equally to foreign and civil wars. In a domestic war the United States exercises belligerent as well as sovereign rights. It is for the commander who is dealing with the actual, critical situation to determine what the necessities demand. If the Executive, when engaged in war, determines a certain measure to be necessary, judicial conjectures as to reasons and motives are not material. *The Prize Cases*, 2 Black, 635; *Hamilton* v. *Dillin*, 21 Wall. 73; *Lamar* v. *Browne*, 92 U. S. 187; *New Orleans* v. *Steamship Co.*, 20 Wall. 393; *Mrs. Alexander's Cotton*, 2 Wall. 404; 1 Halleck Int. Law, 527; 2 Halleck Int. Law, 445, 449; *Matthews* v. *McStea*, 91 U. S. 7; 1 Kent's Com. 66; *The Reform*, 3 Wall. 617; *United States* v. *Grossmayer*, 9 Wall. 72; *Rose* v. *Himely*, 4 Cranch. 241.

The Filipino insurgents proclaimed their independence and proclaimed war formally. They attacked us at Manila, and wherever they were throughout the region of which Manila is the center there were "lines of bayonets." Manila was our

military as well as civil headquarters.  Beneath its ultimate firm control and apparent peace, sedition, plotting and the active propagandism of revolt were going on, with all sorts of secret correspondences with the enemy.  Such a place in such territory, although domestic and occupied by us, is none the less hostile so as to justify war measures.  *Hamilton* v. *Dillin*, and *Lamar* v. *Browne, ut sup.*  The logical result of the opposite view is that we could not call a particular place in belligerent territory hostile unless it were actually occupied by the enemy.  If we did not hold it at all, of course we could not levy duties there.  The claimants fail to realize the distinction between captured territory and hostile territory.

The *Dooley case*, 182 U. S. 222, which suggests that a military commander occupying a southern port during the Civil War could not impose duties upon merchandise arriving from northern ports, also shows that the power would extend as far as the necessities.  There were obvious reasons why they did not extend that far during our Civil War.  Congress, as well as the Executive, was in immediate touch with all the conditions, was exercising its power and legislating constantly for the prosecution of the war, and did not need to commit the conduct of operations wholly to the Executive's instant knowledge and power of prompt action on the spot.  But if at New Orleans, for example (which our forces occupied and administered municipally from 1862 to 1865), there had been active correspondence between the port and the city and the Confederate forces outside, with importing and trading and banking for their benefit among native and foreign sympathizers, could not an embargo have been placed on all commerce, and, *a fortiori*, could not the less rigorous thing have been done, viz., the laying of a tariff upon all merchandise arriving by sea from loyal States as well as abroad?  In that situation the President and Congress did not deem such action necessary.  But here the case was otherwise, and the tariff and port regulations were considered by the Executive an essential part of the military necessities.  In this way inter-

course was controlled, shipments were scrutinized and consignees known and all sorts of correspondences with the hostile forces were traced. The war power should not be curtailed because it avails of ordinary duties; because its strength gives port control and permits the commander to open a port to the commerce of the world. It is no answer to say that everything done was valid except the collection of duties on merchandise from the United States. Revenue and strategical demands alike may have designated those duties as the most important. That is for the commander to determine. If the tariff on American imports must fall in such case, all might go. We were under obligation to Spain to treat her ships and goods like our own, and other nations would then certainly have invoked the most favored nation clause.

*Hamilton* v. *Dillin, supra,* determined that similar charges were valid on three grounds, viz.: that because there was war, the Executive alone possessed authority; that Congress possessed power to authorize in advance, and power to ratify afterwards. That case also determined that under such circumstances payments are voluntary; there is no compulsion to trade. The notion of valid rights of recovery which vested before the ratifying act of Congress was passed cannot be sustained. If there were doubt as to the competence of the war power acting alone, the subsequent approval and ratification by Congress in the Spooner Amendment of March 2, 1901, and the act of July 1, 1902, must be viewed as fully legalizing the action of the Executive. *The Prize Cases* and *Hamilton* v. *Dillin, supra.* Clearly, it is not a case of an unconstitutional delegation of legislative authority. The maxim is that every subsequent ratification has a retroactive effect and is equivalent to a prior mandate. The test always is, does the legislative body which ratifies possess authority to do the act or confer power to do it in the first instance? *Marsh* v. *Fulton Co.,* 10 Wall. 676; *Norton* v. *Shelby Co.,* 118 U. S. 451; *Grenada Co.* v. *Brogden,* 112 U. S. 261; *Brown* v. *Mayor,* 63 N. Y. 239; *Mattingly* v. *District of Columbia,* 97 U. S. 687; *Thomson* v. *Lee Co.,* 3 Wall.

327; *Gelpcke* v. *Dubuque*, 1 Wall. 175; *Fleckner* v. *United States Bank*, 8 Wheat. 338. Here the question is: Did Congress possess authority after the ratification of the treaty to impose customs duties on goods entering from the United States? The answer must be in the affirmative. *Downes* v. *Bidwell*, 182 U. S. 244; "*The Second Dooley Case*," 183 U. S. 151.

The intervening grant of power by Congress and the final ratification authorized and approved the President's acts within the rule. Congress, where it might have accomplished the result by its legislation, can ratify by legislation what was done without legislation. There can be no doubt that on April 11, 1899, Congress might have imposed and continued the military tariff as it did by the act of March 8, 1902. Such legislation by Congress constitutionally authorizes the President, not to legislate, but to continue to act. The ultimate act of ratification legitimately related back and affected the situation in precisely the same way. The legislative approval turned the valid power of the Executive to legislate up to the date of ratification into the equally valid power of the Executive to continue to execute thereafter in accordance with that legislation. By the enactments of March, 1901, and March and July, 1902, Congress accomplished as of the earlier date what it might have accomplished on the earlier date. It acted *nunc pro tunc* and ratified with the effect of a previous authority or previous act of its own.. The stress of the Civil War brought a plain determination of this point without dialectics, as follows: "Whatever view may be taken as to the precise boundary between the legislative and executive powers in reference to the question under consideration, there is no doubt that the concurrence of both affords ample foundation for any regulations on the subject." *Hamilton* v. *Dillin, ut sup.,* 88.

The propositions on which the Government stands are as follows: When there is an imperative necessity for the exercise of the war power, it must itself determine reasons, degree of

necessity and what particular compulsions will meet the requirements. The courts will not usurp that function.

The *De Lima case* simply determined that Porto Rico was domestic territory. The war power was not involved.

The first *Dooley case* determined that after ratification the military tariff was invalid because we had title and peaceful possession and there was no military necessity. The war power was not involved there, but the door was left open in case it were.

The *Diamond Rings case* decided that the Philippines were domestic territory, notwithstanding the insurrection, in title and in possession. Our own tariff was involved, but the war power was not involved.

Here the Philippine military tariff is presented, war was flagrant, military necessities existed, the Executive determined that this provision was demanded and that determination is within the scope of its constitutional authority and will not be reviewed by the courts. The war power was involved.

The *Dooley case* is a true correlative of the *De Lima case*, but the present cases are not the correlative of the *Diamond Rings case*, and there is the fallacy in the claimant's logic. If what was done when we were at war and the necessities were so vital is invalid, and the approval of Congress has no effect, then we are impotent as a Nation. The constitutional authorities are acting together and in harmony, yet before rebellion may be suppressed and anarchy averted, all details of revenue and administration must be referred back to Congress on the other side of the globe, in session only a portion of the time, formal war must be declared, and every step must be prescribed and authorized by a statute in advance. The Constitution was never intended to leave the National power in war and other grave emergencies so cramped and bound, and we do not think it can be construed to have that result. The solemn inquiry before the court is this: when the Nation is struggling with war, is surrounded with difficulties and perils, will the courts assume to say that the combined action

of the Executive and legislature went beyond the necessities, although there was no tyrannical aggression and no violation of sacred guaranties?  This question, of the scope of the war power, its competence and independence, once involved the very existence of the nation, and may do so again.

MR. JUSTICE HOLMES delivered the opinion of the court.

These are suits to recover duties exacted from the plaintiffs in error and appellants upon merchandise shipped by them from New York to Manila, and landed at the latter port between April 11, 1899, the date when the ratifications of the treaty with Spain were exchanged and October 25, 1901.  The duties were levied under an order of the President dated July 12, 1898.  The case of Peabody & Co. was decided on demurrer to the answer of the United States, which set up that during the time mentioned there existed an armed insurrection in the Philippine Islands of such size as to call for military operations by the United States; that, although Manila was in our possession, it was held only by force of arms as a part of hostile territory, and that the President's order was a lawful exercise of the war power of the United States.  The District Court overruled the demurrer and dismissed the suit.  (Not reported.)  The case of Warner, Barnes & Co. was decided on a finding of facts by the Court of Claims, and that court also dismissed the petition.  (C. Cl. Not yet reported.)  These facts mainly concern the magnitude of the insurrection and need not be stated.

It will be observed that the President's order relied upon was an order issued during the war with Spain, nine months before the treaty of peace was made.  It was a measure taken with reference to that war alone, and not with reference to the insurrection of the native inhabitants of the Philippines, which did not happen until much later.  Aguinaldo declared hostilities on February 4, 1899.  The natural view would be that the order expired by its own terms when the war with Spain

was at an end. The order directs that "upon the occupation of any forts and places in the Philippine Islands by the forces of the United States," the duties shall be levied and collected "as a military contribution." Of course, this was not a power in blank for any military occasion which might turn up in the future. It was a regulation for and during an existing war, referred to as definitely as if it had been named. See *Dooley* v. *United States*, 182 U. S. 222, 234, 235.

However this may be, we are of opinion that the cases before us are governed by the decision in *Fourteen Diamond Rings,* 183 U. S. 176, 180, 181. In that case it was decided that after the title passed to the United States there was nothing in the Philippine insurrection of sufficient gravity to give to the Islands the character of foreign countries within the meaning of a tariff act. That means that there was no such "firm possession" by an organized hostile power as made Castine a foreign port in the war of 1812. *United States* v. *Rice*, 4 Wheat. 246, 254. Whatever sway the Philippine government may have had in Luzon we suppose that probably at any time the United States could have sent a column of a few thousand men to any point on the island, as was stated by the Secretary of War in his report in 1899, and as the United States was willing that the Court of Claims should find. In the language of the above mentioned decision: "If those in insurrection against Spain continued in insurrection against the United States, the legal title and possession of the latter remained unaffected."

Apart from the question of the duration of the President's order, it plainly was an order intended to deal with imports from foreign countries only and Philippine ports not in the actual military control of the United States. But even had it been intended to have a wider scope we do not perceive any ground on which it could have been extended to imports from the United States to Manila, a port which was continuously in the possession as well as ownership of the United States from the time of the treaty with Spain. Manila was not like Nashville during the Civil War, a part of a State recognized as

belligerent and as having impressed a hostile status upon its entire territory. *Hamilton* v. *Dillin,* 21 Wall. 73, 94–96. The fact that there was an insurrection of natives not recognized as belligerents in another part of the island, or even just outside its walls, did not give the President power to impose duties on imports from a country no longer foreign. See *Dooley* v. *United States,* 182 U. S. 222, 234.

We see no sufficient ground for saying that the collection of these duties has been ratified by Congress. The only act needing mention is that of July 1, 1902, c. 1369, § 2, 32 Stat. 691, 692. That act ratifies the action of the President "heretofore taken by virtue of the authority vested in him as Commander in Chief of the Army and Navy, as set forth in his order of July twelfth, 1898" etc., together with the subsequent amendments to that order. "And the actions of the authorities of the government of the Philippine Islands, taken in accordance with the provisions of said order and subsequent amendments, are hereby approved." Without considering how far the first part of the section extends, the approval of the action of the authorities is confined to those which were in accordance with the provision of the order, which, as we already have intimated, the collection of these duties was not. See further *De Lima* v. *Bidwell,* 182 U. S. 1, 199, 200.

*Judgments reversed.*