## LINCOLN *v.* UNITED STATES.

## WARNER, BARNES AND COMPANY, LIMITED, *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK. APPEAL FROM THE COURT OF CLAIMS.

Nos. 149, 466. Argued March 3, 1905; decided April 3, 1905; Petitions for rehearing allowed May 29, 1905; Reargued January 18, 19, 1906.—Decided on reargument May 28, 1906.

*Lincoln* v. *United States*, 197 U. S. 419, reaffirmed, after rehearing, to the effect that the Executive order of July 12, 1898, directing that upon the occupation of ports and places in the Philippine Islands by the forces of the United States duties should be levied and collected as a military contribution, was a regulation for and during the war with Spain, referred to as definitely as though it had been named, and the right to levy duties thereunder on goods brought from the United States ceased on the exchange of ratifications of the treaty of peace; that after title to the Philippine Islands passed by the exchange of ratifications on April 11, 1899, there was nothing in the Philippine Insurrection of sufficient gravity to give to those islands the character of foreign countries within the meaning of a tariff act; that the ratification of Executive action, and of authorities under the Executive order of July 12, 1898, contained in the act of July 1, 1902, 32 Stat. 691, was confined to actions taken in accord-

ance with its provisions; and that the exaction of duties on goods brought from the United States after April 11, 1899, was not in accordance with those provisions and was not ratified.

A ratification by act of Congress will not be extended to cover what was not, in the judgment of the courts, intended to be covered, because otherwise the ratification would be meaningless or unnecessary. Congress out of abundant caution may ratify, and at times has ratified, that which was subsequently found not to have needed ratification.

THE facts are stated in the opinion.

*Mr. Paul Fuller, Mr. Frederic R. Coudert* and *Mr. John G. Carlisle,* with whom *Mr. Henry M. Ward* was on the brief, for plaintiffs in error and appellant:[1]

The moneys exacted from the plaintiffs in error and appellants were unlawfully exacted and consequently are still their property. No change of title is operated by illegal seizure. That point is not open to reargument. *Warner, Barnes & Co.* v. *United States,* 197 U. S. 419; *Dorr* v. *United States,* 195 U. S. 138; *Rassmussen* v. *United States,* 197 U. S. 516; *Czarnikow* v. *Bidwell,* 191 U. S. 559; *De Lima* v. *Bidwell,* 182 U. S. 1, 199, 200.

The only question subject to rehearing is the effect of the act of Congress of July 1, 1902, upon the illegal seizure of the moneys of complainants and whether their ownership of the moneys was divested by the operation of said act.

Congress had no power to divest the complainants of their ownership of the moneys or deprive them of their property. Constitution, Fifth Amendment; *United States* v. *Lee,* 106 U. S. 218, 219. Nor could any ratification of an illegal act operate a change of title, nor divest complainants of their vested right to recover the moneys unlawfully exacted. *De Lima* v. *Bidwell,* 182 U. S. 199, 200; *Alter's Appeal,* 67 Pa. St. 433; *Donovan* v. *Pitcher,* 53 Alabama, 634; *Palairet's Appeal,* 67 Pa. St. 341; *Norman* v. *Heist,* 5 W. & S. 171.

[1] There was also a separate brief filed by *Mr. Hilary A. Herbert* and *Mr. Benj. Micou* in behalf of certain claimants having interests similar to those of appellants.

Apart from the right of the complainants to protect their ownership of the moneys as against the United States and to bring suit for recovery,—complainants had a right of recovery against the officer or agent who made the illegal exaction. Such was the recovery in *De Lima* v. *Bidwell, supra.* This right of recovery or right of action against the official who makes the exaction or commits the trespass is recognized in a long line of cases. *Little* v. *Barreme,* 2 Cranch, 170; *Meigs* v. *McClung's Lessee,* 9 Cranch, 11; *Osborn* v. *Bank of U. S.,* 9 Wheat. 738; *Grisar* v. *McDowell,* 6 Wall. 363; *Bates* v. *Clark,* 95 U. S. 204; *United States* v. *Lee,* 106 U. S. 196; *Virginia Coupon Cases,* 114 U. S. 270; *In re Ayers,* 123 U. S. 443; *McGahey* v. *Virginia,* 135 U. S. 662; *Belknap* v. *Schild,* 161 U. S. 10.

Such a right of action constitutes property in the same sense as tangible things and is equally entitled to protection against arbitrary interference or legislative impairment; even to the extent that the denial of a remedy or imposition of new conditions or restrictions upon its exercise is such an interference. Cooley, Const. Lim., 6th ed., 443; Sutherland, Stat. Const. §§ 164, 206; *Steamship Co.* v. *Joliffe,* 2 Wall. 450, 457, 458; *Angle* v. *Chicago, St. P. &c. Ry.,* 151 U. S. 1, 19; *Bronson* v. *Kinzie,* 1 How. 311, 317; *Barnitz* v. *Beverly,* 163 U. S. 118, and cases there collated; *Auffmordt* v. *Rasin,* 102 U. S. 622; *Hubbard* v. *Brainard,* 35 Connecticut, 563.

The limitation upon the right to pass retrospective or retroactive legislation is that it must not interfere with vested rights. *Fleckner* v. *Bank of U. S.,* 8 Wheat. 338, 363; *Society* v. *Wheeler,* 22 Fed. Cas. 767 (per Story, J.), approved in *Sturgis* v. *Carter,* 114 U. S. 519.

All of the cases in the books validating assessments or municipal bond issues have reference solely to the methods of action employed and relate to statutes curative only of defects in the procedure by which an undoubted power has been exercised. Such is the case of *Mattingly* v. *District of Columbia,* 97 U. S. 687, and the many kindred cases. No cases can

be found in this court where the fundamental absence of power to do an act sought to be supplied by subsequent legislation has been upheld.

The distinction is well pointed out in *Lennon* v. *The Mayor,* 53 N. Y. 367, and in *Cromwell* v. *MacLean,* 123 N. Y. 474 (per Peckham, J.).

The constitutional guarantees against protection are as applicable to personal property as to realty. Relief against interference with such property can be had against the United States as well as against individuals. *Osborn* v. *Bank of U. S.,* 91 U. S. 474; *United States* v. *Klein,* 13 Wall. 128; *United States* v. *State Bank,* 96 U. S. 30.

Congress cannot ratify an invalid act unless at the time of ratification it could itself lawfully do the act which it assumes to ratify. Unless Congress could in July, 1902, have legally imposed customs duties upon importations theretofore made into the Philippines, it could not, under guise of ratification, accomplish an identical result. *Grenada Co. Supervisors* v. *Brogden,* 112 U. S. 271; *Norton* v. *Shelby County,* 118 U. S. 457; *Kimball* v. *Rosedale,* 42 Wisconsin, 413.

The power of Congress is limited in the levying of duties to a tax upon the importation of merchandise; if merchandise has been imported in accordance with existing law, free from duty, and is mingled with the property of the country, Congress has no authority to levy duties upon it. Complainants' merchandise was imported free of duty in accordance with the law at the time of its importation and Congress cannot by a retroactive law sanction the imposition of the duty upon goods not subject to it at the time of their importation.

The act of July 1, 1902, does not disclose any intention to legalize the collection of duties which this court had decided to have been unlawfully exacted. Duties are never imposed upon vague or doubtful interpretations; the requirement of a tax law is that any intention to impose a burden upon the citizen must be expressed in clear and unambiguous language. *Hartranft* v. *Wiegmann,* 121 U. S. 609; *Am. N. & T. Co.* v

*Worthington,* 141 U. S. 468. There is no such intention expressed in clear language; if such was the purpose of Congress it could have been expressed in language of the utmost simplicity. Under the decisions quoted such an intention cannot be inferred.

Such an inference would assume that the Government is unwilling to fulfill its obligations, pay its debts and do justice to the citizen. This is a supposition that cannot be indulged in. *Gibbons* v. *United States,* 8 Wall. 274. It is as much the duty of the Government as of individuals to fulfil its obligations and no assumption can be indulged in that the United States intended to deprive the citizen of his property without compensation. *United States* v. *Klein,* 13 Wall. 144; *Meigs* v. *McClung's Lessee,* 9 Cranch, 11; *United States* v. *State Bank,* 96 U. S. 30.

A contrary intent is shown in cotemporary acts of Congress authorizing the refunding to citizens of duties unadvisedly collected. Act of April 29, 1902, 32 Stat. 176; act of March 3, 1903, 32 Stat. 1224; act of March 3, 1905, 33 Stat. 1013. It may rightfully be presumed that the legislature never intends to interfere with the action of the courts. *Angle* v. *Chicago & St. P. Ry.,* 151 U. S. 20. To infer such an intention would assume that Congress intended to ignore the prohibitions of the Fifth Amendment and such a presumption will never be assumed. *Supervisors* v. *Brogden,* 112 U. S. 269, and cases collated in *Hawaii* v. *Mankichi,* 190 U. S. 214.

. The act of July 1, 1902, § 5, extends to the Philippines the constitutional guarantees for the protection of property which is inconsistent with the intention attributed to the act of depriving citizens of property without a hearing. The act only purports to ratify the action of the President as set forth in the order of July 12, 1898, and the action of the authorities "taken in accordance with the provisions of said order." It has already been held that the order was only intended to enforce the payment of duties on goods from foreign countries and that it ceased to apply to the Philippines, when the Philip-

pines ceased to be foreign.  *Dooley* v. *United States,* 182 U. S. 235; *Lincoln* v. *United States,* 197 U. S. 428.

The act did not ratify nor assume to ratify acts done beyond the sanction of the order or under misinterpretations of the order.  The authorities misinterpreted the order in applying it to the Philippines, after the Philippines had ceased to be foreign as held in the *Fourteen Diamond Rings,* 183 U. S. 176.

What the act of July 1, 1902, probably intended to ratify and did ratify was the action of the President in applying the order and in enforcing certain additional or amendatory orders after the ratification of the treaty of peace, such as applying a tariff between the Philippines and foreign countries, different from the congressional tariff applicable to the United States, contrary to the rulings of this court in *Cross* v. *Harrison,* 16 How. 164.  *Dooley* v. *United States,* 182 U S. 222; *De Lima* v. *Bidwell,* 182 U. S. 184. And the further assumption of authority by the President in adding articles to the dutiable list (Tariff Circular No. 53, War Department, 17 Apr., 1899), in constituting the Philippines and the Island of Guam into a collection district, creating ports of entry and directing the appointment of collectors, auditors, etc.  Tariff Circular No. 65, War Department, 5th May, 1899; Circular No. 20, Division of Custom and Insular Affairs, 8 May, 1899.

The exercise of these powers in time of peace were of questionable validity and a proper subject for congressional ratification.

*The Attorney General* and *The Solicitor General* for the United States: .

The failure of Congress at the outset to enact as to the Philippine tariff specifically as soon as the treaty of December 8, 1898, was ratified, must be taken, we think, to mean that Congress also supposed that the war power of the President was ample and extended to the new armed conflict.  The legislature not disapproving, its silence signified assent and acquiescence.  Apart from formal recorded proceedings, com-

mittee action, the taking of testimony, etc., it must be conclusively presumed that Congress was fully informed at all stages and knew exactly what was taking place and being done both in the military campaigns and in civil administration. The formal and concrete action of Congress during the insurrectionary period up to the enactment of the Spooner amendment was logically confined to providing men and munitions. This was necessary for Congress to do, and this is all that was necessary for it to do consistently with the idea of its tacit assumption of the extent of the executive power and its tacit agreement in the propriety of the excutive acts. Plainly no unfavorable inference can be drawn from this essential "legislation of the purse," as containing in the affirmative grant a sort of negative pregnant; this is not a prohibition on the President or any dissent whatever from the civil and military programme of his administration.

Then came the Spooner amendment in March, 1901, and whatever else may be pertinent to say about it, this much is certain—that it followed by substantial reproduction of language the precedent of the Louisiana case (act of October 31, 1803; 2 Stat. 245); that there could not well be a broader grant of power giving the President all possible authority to cover every phase of the Philippine emergencies and necessities, and that the general intention of Congress at that point to approve comprehensively what the President had previously done, and to authorize him comprehensively to act thus in future, appears too plainly for any discussion.

The act of March 8, 1902, was the adoption by Congress itself, as its own tariff law for the Philippines, of the existing provisional tariff, without any change, and specifying that it applied to merchandise entering the Philippines from the United States. This statute altogether disposed for the future of the question of the validity of the taxation, and of course falls completely within the ruling of the insular cases respecting the constitutionality of the analogous law for Porto Rico —the Foraker Act. No reasonable mind could doubt that the

fair and natural inference from this act is that Congress had followed the proceedings in the tariff field respecting the Philippines and approved what had been done, although so far without specific ratification as to the past. In other words, this act throws light on the real intendment of Congress in the ratifying act of the following July.

It is certainly difficult to a plain apprehension approaching the confirming act of July 1, 1902, and reading the language in the light of the previous facts which we have briefly set forth, to conceive that Congress did not mean to foreclose this subject when it approved, ratified, and confirmed the action of the President as set forth in his order of July 12, 1898, together with the subsequent amendments of said order, and approved the action of the authorities of the government of the Philippine Islands taken in accordance with the provisions of said order and subsequent amendments.

With deference, it seems like ignoring the plain meaning and searching for hidden significance and distinctions which were not at all in the mind of Congress and do not really exist, to say that the statute was meant to ratify the President's action only so far as taken by virtue of his undoubted authority as Commander in Chief, and approved only those proceedings and doings of his subordinate officers which were in unquestioned accordance with the provisions of the order; that is, as applicable only before April 11, 1899; because all those actions of the Executive (prior to April 11, 1899) were unquestionably valid without ratification by Congress under established principles of public law.

Long before the act was passed this court said when it decided in *Dooley* v. *United States*, 182 U. S. 222, that the executive action imposing duties upon goods imported into Porto Rico up to the date of ratification of the treaty of peace was entirely valid.

The language used has this full force and significance and it is impossible to restrain and confine it to the time, and the executive action, before April 11, 1899, unless the

words of the statute are wrested from their obvious and natural import.

Congress could have authorized the imposition of duties in advance, and therefore could ratify afterwards. There was no illegal delegation of legislative power or approval tantamount to attempted illegal delegation by relation back. The President's tariff order was a military decree, operating with the compulsion of a command upon all subordinate officers. It is misleading to treat it as legislation. But in either aspect, as military mandate or law, it was valid in origin. *Dooley* v. *United States*, 182 U. S. 222, 230.

. When its constitutional authority expired on April 11, 1899, the Executive was acting, not legislating, believing the action authorized; it was proceeding *de facto.* There was no legislation or revival of legislation. The subsequent amendments to the order were administrative directions to military officers and were believed to rest on the war power. When Congress approved, it did not seek to revitalize a legislative power or validate, *nunc pro tunc* an unconstitutional exercise of such power. It simply confirmed the acts done and adopted the effects of the previous originating legislative cause, which was efficacious *de facto*, although its legal validity had expired. It was efficacious *de facto* because the acts were done in point of fact.

Clearly, Congress could have authorized in advance. On April 11, 1899, it could have passed the Philippine tariff act which it passed March 8, 1902. *Downes* v. *Bidwell*, 182 U. S. 244. On April 11, 1899, it could have authorized the President to proceed as he did, to continue the operation of the tariff order which he had already imposed and under which, in fact, he steadily collected duties. That is to say, on April 11, 1899, Congress could have adopted the Spooner amendment of March 2, 1901, which the court fully recognizes as a constitutional delegation of power to the President and his subordinate executive agencies, resting on the authority of Congress to "make all needful rules and regulations respecting

the territory  .  .  .  belonging to the United States." *Dorr
v. United States,* 195 U. S. 138, 143, 153.

This case does not involve the consequence that Congress
must be able to lay a retrospective tax, that is, impose duties
now on a transaction of, say, five years ago. But if such a
tax were equal and uniform, what is to prevent? Congress
perhaps is not likely so to tax; it might be unwise or even
unjust, but it would be constitutionally valid. There is no
precise authority, but this is manifestly the tendency and
effect of *Stockdale* v. *Insurance Companies,* 20 Wall. 323.

As to the notion of vested rights. This case does not fall
within that exception, either, as preventing subsequent ratifi-
cation by Congress.

On the general doctrines about ratification we cite the
following authorities additional to those cited on the original
hearing. *State* v. *Squires,* 26 Iowa, 340; *Grogan* v. *San Fran-
cisco,* 18 California, 590; *McCauley* v. *Brooks,* 16 California,
1, 27; *McCracken* v. *San Francisco,* 16 California, 591; *Brady*
v. *Mayor &c.,* 16 How. Pr. 432; *Zottman* v. *San Francisco,*
20 California, 97; *Peterson* v. *Mayor &c.,* 17 N. Y. 449; *Schneck*
v. *City of Jeffersonville,* 152 Indiana, 204; *Marks* v. *Purdue
University,* 37 Indiana, 155.

The vested right must be one which is constitutionally
protected, that is, the right to be compensated when private
property is taken for public use, and the right to have due
process of law. It is idle to claim that legislation may not
affect vested rights of property, and no man has a vested
right not to be taxed. There was due process of law here,
because when these duties were levied, the law of the Philip-
pines, like our own law, fully provided for protest and hearing.
That is, there was entire compliance with the rules of due
process as to tax levies. It is only when there is no notice to
the taxpayer or some other vital defect, as in the authorities
cited by our adversaries, that the tax is illegal. There is no
more reason for saying that private property is taken here
for public use without compensation, than in any other case

of taxation. All these suggestions beg the question. The very inquiry before the court is whether these duties are the claimants' property.

The power of a legislature to confirm embraces not only cases where mere irregularities or informalities in procedure are cured, but where there was a total want of authority in the executive officer and the tax levies were therefore utterly void. It makes no difference if rights are divested. To legalize a tax in this way does not unconstitutionally interfere with vested rights. There is no right of action vested beyond control by the curative act, and the bringing of suit makes no difference. *Iowa R. R. Land Co.* v. *Soper,* 39 Iowa, 112, and cases cited; *Grim* v. *School District,* 57 Pa. St. 433. The power to tax, and especially the Federal power to tax, is unlimited, and the constitutionality of retrospective laws has been sustained many times. The real question is whether the retrospective intention is clear. In *De Lima* v. *Bidwell,* 182 U. S. 1, 199, the retroactive effect of the statute rested on inference, and the court naturally construed it as not intended to operate retroactively. This law is, however, expressly and manifestly retroactive, leaving no room for construction. The claimants appear to repudiate the idea that the filing of suit makes any difference, by which they seem to mean that their mere right of action is protected, and probably have in mind the numerous suits filed after July 1, 1902. If the intention of Congress is sustained by the court and only the retroactive power denied, manifestly those suits fall. But we go beyond the claimants' concession. We say that a right of action is not a vested right of property, and that the bringing of suit even before the passage of the act does not vest a right. The state authorities cited for the contrary view in *De Lima* v. *Bidwell,* 182 U. S. 200, on analysis show that the bringing of suit was not the real ground of decision. For instance, in *Palairet's Appeal,* 67 Pa. St. 479, it was simply held that an act of assembly providing for the extinguishment of irredeemable ground rents was unconstitutional, because it took ·

private property for private use without consent of the owner. There is no such case here. There is no taking even for public use, because, on fundamental and firmly established principles, burdens on property imposed under the power of taxation do not constitute a taking of private property for public use without compensation.

Further, in *De Lima* v. *Bidwell* there was due protest. There was no protest at all in these cases, written or verbal, formal or informal. That alone is a sufficient ground for denying this claim. Protest is a necessary preliminary to establish any claim. The authorities without exception sustain the contention that where there is no protest the payment is voluntary and cannot be recovered. *Elliott* v. *Swartwout*, 10 Pet. 137; *Bend* v. *Hoyt*, 13 Pet. 263; *Converse* v. *Burgess*, 18 How. 413; *Philadelphia* v. *Collector*, 5 Wall. 720; *Nicholl* v. *United States*, 7 Wall. 122; *Wright* v. *Blakeslee*, 101 U. S. 174; *Barney* v. *Rickard*, 157 U. S. 352; *Chesebrough* v. *United States*, 192 U. S. 253. And see especially *Hamilton* v. *Dillin*, 21 Wall. 73, 92; and *Cross* v. *Harrison*, 16 How. 201, as to the supposed "compulsion" resting on importers. No valid reason can be given why absence of protest cannot now be set up as a defense.

Mr. Chief Justice Fuller delivered the opinion of the court.

These are suits to recover duties exacted from plaintiffs in error and appellants upon merchandise shipped by them from New York to Manila, and landed at the latter port between April 11, 1899, the date when the ratifications of the treaty with Spain were exchanged, and the treaty proclaimed, and October 25, 1901. The duties were levied under an order of the President, dated July 12, 1898. The cases were argued in this court March 3, 1905, and the judgments reversed April 3, 1905. 197 U. S. 419, 429.

We ruled that the order of July 12, 1898, was a regulation

for and during the then existing war with Spain, referred to as definitely as if it had been named, and that the right to levy duties thereunder on goods brought from the United States ceased on the exchange of ratifications. *Dooley* v. *United States*, 182 U. S. 222.

And that after title passed, April 11, 1899, there was nothing in the Philippine insurrection of sufficient gravity to give to the islands the character of foreign countries within the meaning of a tariff act. *Fourteen Diamond Rings*, 183 U. S. 176. As to the subsidiary point that whether the exaction of the duties ·was lawful or not, it had been ratified by the act of July 1, 1902, 32 Stat. 691, 692, c. 1369, § 2, we were of opinion that the ratification of "the actions of the authorities. . . . taken in accordance with the provisions of said order and subsequent amendments" was confined to actions which were taken in accordance with the provisions of the order and amendments, which these exactions were not. May 29, 1905, we allowed petitions for rehearing to be filed addressed solely to the matter of ratification, and subsequently (November 13) a rehearing was granted "as to the question whether Congress ratified the collection of the sums sought to be recovered in these suits."

The cases were reargued January 18 and 19 on that question.

That the moneys exacted from plaintiffs in error and appellants were illegally exacted is not open to question under our order, unless the act of July 1, 1902, operated to the contrary. The second section of that act reads as follows: "That the action of the President of the United States heretofore taken by virtue of the authority vested in him as Commander in Chief of the Army and Navy, as set forth in his order of July twelfth, eighteen hundred and ninety-eight, whereby a tariff of duties and taxes as set forth by said order was to be levied and collected at all ports and places in the Philippine Islands upon passing into the occupation and possession of the forces of the United States, together with the subsequent amendments of said order, are hereby approved, ratified, and confirmed, and the actions of the authorities of the government of the Philip-

pine Islands, taken in accordance with the provisions of said order and subsequent amendments, are hereby approved."

The order of July 12, 1898, by President McKinley, as Commander in Chief, directed that upon occupation of any ports or places in the Philippine Islands by the forces of the United States an accompanying tariff of duties and taxes should be levied and collected as a military contribution, and that regulations for its administration should take effect and be in force in the ports and places occupied. Manila was captured August 13, and the next day the custom house was opened and taxes were collected according to the prior Spanish tariff up to November 10, 1898, until which date the order of July 12 had been suspended.

On the rehearing an order of the Military Governor of the Philippines of October 26, 1898, which embodied the full text of the customs tariff and regulations, was brought forward, and was in all essential respects a repetition of the order of July 12.

The Porto Rican cases were decided May 27, 1901, and in June the Secretary of War cabled the commission at Manila that: "The most obvious distinction between the status of Porto Rico and the Philippines, after the cession, indicated in the opinions of the court, is in the fact that Porto Rico was at the time of cession in full peaceable possession, while a state of war has continued in the Philippines. As the question of the President's power to impose duties in the Philippine Islands under the existing conditions of military occupation has not been decided by the court, the President has determined to continue to impose duties as heretofore."

Undoubtedly the order of July 12, 1898, contemplated vessels from America as well as others, yet that order, having been made in time of war, for a military contribution, when the Philippines did not belong to us, must be taken to have contemplated them, as it contemplated those from other countries, as vessels foreign to the country, and to have imposed the tax upon them *qua* foreign. The military tax was, so to speak, a seizure of Spanish revenues. That was what the order meant

when it was passed, and a change of circumstances did not change its meaning. Neither was the meaning changed by any amendment. The ground on which it was kept in force by the Secretary of War, June 8, 1901, was that the Philippines were still in a state of war. If that view had been correct the order would have applied and would have had lawful effect, but it turned out not to be correct.

The ratification may be assumed to apply to the order as actually made, and not to have been limited to such an order or so much of this order as the President had a right to make. But it does not construe the order, and as it confines the ratification to actions in accordance with the order and amendments, the question what actions were in accordance with them is for us. The statute does not ratify all actions or all collections of taxes, as it easily might have done, but only actions in accordance with the order. If the order properly construed did not purport to apply to vessels unless they were either enemy or foreign, then when a vessel ceased to be foreign the order did not apply, and a tax upon such a vessel not being in accordance with the order is not ratified by the act. This construction is favored by the consideration that the suits had been begun when the act of July 1, 1902, was passed, and that, even if Congress could deprive plaintiffs of their vested rights in process of being asserted, *Hamilton* v. *Dillin*, 21 Wall. 73, still it is not to be presumed to do so on language which, literally taken, has a narrower sense.

Moreover, the act of July, 1902, was passed with full knowledge and after careful consideration of the decisions of this court, and Congress was aware that grave doubt, at least, had been thrown upon its power to ratify a tax under circumstances like the present. *De Lima* v. *Bidwell*, 182 U. S. 1, 199, 200. This affords a special reason for believing that if it had intended to encounter the limitations of that case it would have done so in clear words from which there was no escape.

It should also be remembered that there was a powerful opposition in Congress and that the phraseology of the act prob-

ably represents all that it was deemed safe to ask. Every consideration requires that the ambiguous language of the act should not be stretched beyond the exact and literal meaning of the words. In a literal sense they ratify only actions in accordance with the order construed as it would have been construed by this court had it come before us upon the day when it was made.

It is not a sufficient answer to say that the ratification was meaningless unless it embraced duties collected on imports from the United States after April 11, 1899, because the exactions before were legal. The instances are many where Congress out of abundant caution has ratified what did not need, or was afterwards found not to have needed, ratification. *Cross v. Harrison*, 16 How. 164; *Prize Cases*, 2 Black, 635.

It would be inadmissible to lay down as a general rule that a particular ratification covered what was not, in the judgment of the courts, included or intended to be, simply because it might be thought to have been otherwise unnecessary.

In these cases, however, the ratification act was not otherwise meaningless. Duties were collected under the order of July 12, 1898, as a military contribution while the war with Spain was in progress. The treaty was signed December 10, 1898, and the President on December 21 issued an order proclaiming the sovereignty of the United States in the islands and directing duties and taxes to be collected in future as public revenues for the support of the government. When the treaty was ratified the applicable laws of the United States became operative, but the President, nevertheless, continued in force the tariff created by the order of July 12, 1898, and by an order of April 21, 1899, established a collection district with Manila as the chief port of entry, and under these orders collections of duties were made. This involves the question whether after April 11, 1899, the President could have enforced any tariff other than such as existed under acts of Congress or might be sanctioned by Congress. And that question was put at rest by this ratification.

Much more might be said, but we think it would needlessly prolong this opinion.

Notwithstanding the able argument of the Attorney General, we adhere to the conclusion previously announced.

*Judgments reversed.*

MR. JUSTICE WHITE, with whom concurs MR. JUSTICE McKENNA, dissenting.

Although I dissented in *De Lima* v. *Bidwell*, 182 U. S. 1, *Dooley* v. *United States*, 182 U. S. 222, and *Fourteen Diamond Rings*, 183 U. S. 176, nevertheless I agreed to the judgment of reversal as previously rendered in this case. 197 U. S. 429. I was constrained so to do because to me it seemed that the determination of the substantial issues in the case were foreclosed by the prior cases above mentioned, which were binding on me under the rule of *stare decisis*. It is true that in this case, as previously argued and decided, there was present the question of an alleged ratification by Congress of the imposition and collection of the taxes in controversy; but, on the former argument, my attention was not directed to public reports and documents throwing light upon the scope of the ratifying act, as was done on the present argument. Construing the act of Congress which is relied upon to establish the ratification, by the light of the public documents referred to, my mind sees no possible escape from the conclusion that that act was intended to and did ratify the collection of the charges complained of. Having no doubt of the power of Congress to ratify, to my mind it clearly results that I erred in giving my assent to the previous judgment of reversal, and I therefore dissent from the opinion and conclusion of the court now announced.

I am authorized to say that MR. JUSTICE McKENNA concurs in this dissent.