Barney, J.,
delivered the opinion of the court:
The amended petition in this case, the original of which was filed July 1, 1902, alleges that the claimant shipped merchandise from ports in the United States into the Philippine Islands between April 11, 1899, and November 15, 1901, *65 upon which they paid duties under the customs tariff atad regulations promulgated by the Executive order of July 12, 1898, and subsequent amendments. It is alleged that between November 10, 1898, and November 15, 1901, certain army officers were designated under orders of the President to act, and did act, as collectors of customs at the ports of the Philippine Islands, and that upon the arrival at the port of Manila of articles brought by claimant from the United States the said military officers, acting as such collectors of customs and pursuant to and in accordance with said orders and regulations, took possession of such merchandise and placed it under military guard, in the manner prescribed by said regulations, proceeded to assess and levy duties thereon at the rate therein established, and refused to deliver possession of the same to the claimants until the payment in cash of such duties, and threatened, in the event of the default in the payment of such duties, to seize such merchandise with the military force at their command and to sell the same for the payment of such duties; that the claimants were compelled to and did pay to such military officers, acting as such collectors of customs, the amount of duties so assessed by him, but under duress, and in order to obtain possession of their said merchandise and in order to carry on their said business; • and upon such payment said merchandise was released to them.
This action is brought to recover from the defendants the amount of the duties so paid by the claimant.
To this petition the defendants demur, and the questions raised by the demurrer are:
(1) Is the Government a proper party defendant? (2) Do the allegations of the petition negative a voluntary payment? (3) Did the validating act of June 30, 1906, legalize the collection of the duties of which the claimant complains? The demurrer of the defendants admits the truth of all the allegations contained in the petition properly pleaded, so that we must look to that pleading alone to determine these questions.
I. As to the first contention of the defendants we shall devote but little attention, from the fact that when the War *66 ner, Barnes & Co. case was before this court the same point was raised, and while the petition was dismissed by this court on other grounds, the case went to the Supreme Court, and was there considered twice (Lincoln et al. v. United, States, 197 U. S., 419; 202 U S., 484), and the decision of this court was reversed. While it was urged upon the argument of the demurrer in this case that this point was not considered in the Supreme Court, it hardly seems possible that so important a question should have entirely escaped the attention of the able counsel, as well as the court, in that case.
It appears from the allegations in the petition, and is also a historical fact, that the order of July 12, 1898, was issued by the President as a war measure during the Spanish war, and that the tax thereunder was collected by the military authorities of the United States. It is also alleged that “ The several military officers of the United States, acting as collectors of customs as aforesaid, paid over the several amounts of duties so collected by them from your petitioners as aforesaid to the United States, and the whole amount of such duties is now held by the' United States.” Section 4 of the act of March 8, 1902, provided: “That the duties and taxes collected in the Philippine Archipelago * * * shall be held as a separate fund and paid into the treasury of the Philippine Islands, to be used and expended for the government and benefit of said islandsand, as was said by Judge Wright in his opinion in the Warner, Barnes & Co. case (40 C. Cls. R., 1, 31, 32), “ such tariffs were collected solely as a military contribution. * * * The money was not cov-
ered into the Treasury of the United States, but was applied by the military government toward its own expenses in prosecuting the war, etc.”
In short, this tax was collected by the military authorities of the United States and not by the authorities of the Philippine Islands, and if this collection was illegal we have no doubt the United States are liable for its return, unless they have some good defense thereto.
II. Upon the question of voluntary payment raised by the demurrer of the defendants we might repeat what has already been said upon the first point raised, viz, that a case involving the same question has been before this court before, *67 and twice in the Supreme Court, and, while it was not mentioned in the opinions, it is hardly possible that it was entirely unnoticed by either court or eminent counsel who were • engaged on either side.
We deem it, therefore, unnecessary to enter into an extended discussion of the question raised, but will only refer to the case of Swift Co. v. United States (111 U. S., 22), which appears to us to settle it. The opinion in that case, rendered by Justice Matthews, fully considers the question of voluntary payment under similar circumstances, referring to numerous authorities which we think are clearly applicable to the case at bar, and is ample authority for holding that the allega- ' tions in the petition make the payment of the tax in question involuntary.
This case .was cited approvingly in United States v. Ed-mondston (181 U. S., 500), where it is said:
“ As indicated in the opinion in Swift Co. v. United States, there are cases in which the formality of a protest or objection is unnecessary; some things may be taken as equivalent thereto or as sufficient in lieu thereof.” (Ibid., 514.)
See Cooley on Taxation, 3d ed., 1505-1506.
Our attention has been called to certain regulations of the revenue department prescribing the manner and form of making protests to assessments of import duties. It is only necessary to say that the tax or imposition complained of in this case was an exaction upon goods which were not imported at all. (Dooley v. United States, 182 U. S., 222, 225.) It can hardly be successfuly maintained that the Government can impose an illegal tax and at the same time prescribe the only manner in which objections can be made to its payment.
III. We now come to the most important and difficult question in the case, which is that raised by the contention that the act of June 30, 1906, validated all of the taxes collected by virtue of the order’of July 12,1898, and, of course, the taxes in question paid by the claimant. It is perhaps unnecessary to say in this connection that the decision of the Supreme Court in the insular cases makes the requirement of all duties after April 11, 1899, the date of the ratification of the Spanish treaty, until such duties were provided for by the Congress, contrary to law; hence the ques *68 tion whether the act of June 30, 1906, was curative of this illegality. The deficiency appropriation act of June 30, 1906, contained the following provision:
“ That the tariff duties, both import and export, imposed by the authorities of the United States or of the provisional military government thereof in the Philippine Islands prior to March eighth, nineteen hundred and two, at all ports and places in said islands upon all goods, wares, and merchandise imported into said islands from the United States or from foreign countries, or exported from said islands are hereby legalized and ratified, and the collection of all such duties prior to March eighth, nineteen hundred and two, is hereby legalized and ratified and confirmed as fully to all intents and purposes as if the same had by prior act of Congress been specifically authorized and directed.” (34 Stats. L., —.)
It must be admitted that this provision is unmistakable in its language and broad enough to completely cover the case if it is possible for Congress so to do.
We fully recognize the rule that a court should never declare a legislative act unconstitutional, and thereby refuse to obey its mandate, except upon the most careful consideration, and then only where there is hardly room for reasonable doubt. In the present case, however, we do not regard the question as an open one, as the Supreme Court, before the passage of the aqt in question, declared such a law to be unconstitutional as applicable to the case at bar, and in so doing used the following language, in commenting upon the act of March 24, 1900, chapter 339 (31 Stat. L., 151), and which was invoked by the counsel for the United States as having curative force under like circumstances:
“As the action in this case was brought March 13, 1900, eleven days before the act was passed, the right to recover the money sued for could not be taken away by a subsequent act of Congress. Plaintiffs sue in assumpsit for money which the collector has in his hands, justly and equitably belonging to them. To say that Congress could by a subsequent act deprive them of the right to prosecute this action would be beyond its power. In any event, it should not be interpreted so as to make it retroactive.” (De Lima v. Bidwell, 182 U. S., 199-200.)
In the case of Dooley v. United States (supra) the court held that the right to collect duties on goods brought from *69 the United States into the Philippine Islands under the President’s order of July 12, 1898, ceased on the exchange of ratifications of the treaty.
Later, in the case of Lincoln v. United States, and Warner, Barnes & Co. v. United States (202 U. S., 484),the court,in speaking of the effect of the ratification act of July 1, 1902, says:
“ The statute does not ratify all actions or all collections of taxes, as it easily might have done, but only actions in accordance with the order. If the order, properly construed, did not purport to apply to vessels unless they were either enemy or foreign, then when a vessel ceased to be foreign the order did not apply, and a tax upon such a vessel, not being in accordance with the order, is not ratified by the act. This construction is favored by the consideration that the suits had been begun when the act of July 1, 1902, was passed, and that, even if Congress could deprive plaintiffs of their vested rights in process of being asserted (Hamilton v. Dillin, 21 Wall., 73), still it is not to be presumed to do so on language which, literally taken, has a narroiver sense.”
Here we have a decision to the effect that Congress, in terms at least, could easily have ratified the collection of the duties. But inasmuch as no time is there mentioned when such act, to be effective, could have been passed, and the ruling in the case of De Lima v. Bidwell is cited approvingly, we again turn to the De Lima case, where we find in the paragraph quoted therefrom two things established: (1) That “ the right to recover the money sued for could not be taken away by a subsequent act of Congressnor could such act deprive a claimant of his right to prosecute a pending suit. (2) That such act should not in any event be interpreted so as to make it retroactive.
Such being the decision of the Supreme Court, we do not regard the question of the constitutionality of the ratifying act of June 30, 1906, an open one, however much we might otherwise incline to apply the act in the present case.
Although we incline to the belief that we are bound by the decisions of the Supreme Court referred to, still in view of the importance of the case, as well as our embarrassment at the seeming conflict between the legislative and judicial departments of the Government, we think it not out of place *70 to refer to the ruling in other cases respecting what proceedings or acts may be the subject of ratification. ,
There are few questions which have been more frequently before courts for determination than those of retrospective and curative statutes relating to taxation, and for that reason such a variety of facts have been presented in these cases that the majority of them give but little light in the decision of the present case.
Most of these cases present the question of the curative force of statutes applicable to the failure to comply with provisions of law relating to the assessment and collection of the tax, but where the tax itself ivas not fundamentally illegal; others, however, belong to an entirely different class, and involve the right of the legislative department to cure an entire want of authority of the tax executive to act at all; in other words, by retrospection to create a tax which was not a tax before. While some of the first class mentioned come very close to the border line of those cases involving the right to collect any tax at all — i. e., the very groundwork of the taxation — we believe a clear distinction exists between' the two classes, which has generally been recognized by the courts and which is fundamental in their decisions.
It is proper also to remark that there is a lack of harmony in some of these cases, and to such an extent as to make it impossible to reconcile many of them; yet we think it can safely be said that the distinction above referred to has been recognized in all of them whenever such distinction was necessary to the decision of the case. The following are a few of the many cases of the first class, i. e., where the statute seeks only to cure some irregularities in the levying and collection of the tax, but Avhere authority for the tax itself existed; or that it was justifiable either in the way of unsatisfied judgments against the municipality, public improvements made according to law, or the like: Iowa Ry. Co. v. Loper (39 Iowa, 112) ; Nottage v. Portland (35 Oreg., 539) ; Butler v. Toledo (5 Ohio St., 225) ; Dean v. Borschenius (30 Wis., 236). (See cases cited on p. 514, Cooley on Taxation, and in Black on Constitutional Prohibition, sec. 215.)
*71 There is no conflict of the authorities in this class of cases, and the law is well settled that the legislature by a retrospective statute can cure such irregularities.
Before citing and commenting upon some of the cases where legislatures by retrospective statutes have attempted to cure the levying and collection of taxes for which there appeared to be no authority whatever, we will call attention . to the comment of text writers upon the subject.
Judge Cooley, in his valuable work on Taxation, says:
“ One very precise limit, to the power to cure these proceedings is this: They can not be cured when there was a lack of jurisdiction to take them. This is a rule applicable to every species of legal proceedings. Curative laws may heal irregularities in action, but they can not cure a want of authority to act at all.” (Ibicl., 514, 3d ed.)
The same author, in his-work on Constitutional Limitations, says:
“ So he who was never bound either legally or equitably can not have a demand created against him by a mere legislative enactment.” (Ibid., 454, 6th ed.) “A retrospective statute curing defects in legal proceedings where they are in the nature of irregularities, and do not extend to fnatters of jurisdiction, is not void on constitutional grounds, unless expressly forbidden.” (Ibid., 456.) “ If the thing wanting or which failed to be done, and which constituted the defect-in the proceedings, is something the necessity for which the legislature might have dispensed with by prior statute, then it is not beyond the power of the legislature to dispense with it by subsequent statute.” (Ibid., 457.) “A curative statute can only be valid when the defect which it seeks to obviate is the lack of some formality which the legislature might have dispensed with in advance, or where the irregularity which is intended to be excused is one which the legislature might in advance have rendered immaterial.” (Black on Constitutional Prohibition, sec. 215.)
In the early case of Fletcher v. Peck (6 Cranch, 87), where one of the questions before the court was the constitutionality of an act of the legislature of Georgia which sought to impair the land title of one of the parties, in delivering the opinion of the court, Chief Justice Marshall (Ibid., 185-136) said :
“ It may well be doubted whether the nature of society and' of government does not prescribe some limits to the legis *72 lative power; and if any be prescribed, where are they to be found, if the property of an individual, fairly and honestly acquired, may be seized without compensation ? To the legislature all legislative power is granted; but the question whether the act for transferring the property of an individual to the public be in the nature of the legislative power is well worthy of serious reflection.”
In Bennett v. Fisher (26 Iowa, 497, 501), Chief Justice Dillon, in speaking of retrospective laws, says :
“ Such exercise of power can only be defended upon principle and sustained in laiv where they are not directed against the vested rights of particular individuals or classes.”
The case of Hart v. Henderson (17 Mich., 218) involved the constitutionality of a legislative act which was sought to be construed as validating an illegal tax. In declaring the act, with- such construction, as unconstitutional, Judge Cooley, in speaking for the court, says:
“ Curative statutes may cover any mere irregularity in the course of proceeding for the enforcement of a lawful demand; but they can never cure a want of jurisdiction, either in tax proceedings or those of any other description. Nothing is a tax simply by being called so, for any proceedings by which a man’s property is to be taken from him on a claim which has no other basis than the naked declaration of the legislature that it shall constitute a demand against him is unconstitutional and void.”
In the case of Kimball v. Rosendale (42 Wis., 407), this question was discussed by Chief Justice Ryan, and he said:
“ Perhaps the true limit of the curative power of the legislature, as gathered from all the authorities and sanctioned by principle, is, or ought to be, that it can reach things voidable only, not void; defects of execution only, not of authority or jurisdiction; and is confined to defective proceedings under previous legislative authority.” (Ibid., 412-413.)
In the case of Daniels v. Watertown (61 Mich., 514), personal property had been seized and sold by the tax collector under a void assessment, and after suit brought by the owner of the property against the town to recover the proceeds of the sale the legislature passed a curative act validating the assessment. It was held that the rights of the parties became vested prior to such legislation and were not affected thereby.
*73 In People v. Goldtree (44 Cal., 325), in passing upon the constitutionality of a legislative act enacted for the purpose of curing a defective assessment of taxes, the court says:
“ It is impossible, to draw a well-defined line between the classes of defects which may and those which may not be remedied by curative legislation, nor are the authorities on the subject reconcilable.”
And, further:
“ We think it can safely be laid down as a rule in these matters that whenever the officer had no power or jurisdiction to do the act in question, and not that in its performance he did not pursue the law in respect to time, mode, or some other particular, the act is void, and subsequent legislation can not cure the defect.”
The counsel for the defendant has cited Grim v. Weissenberg (57 Pa. St., 438) as sustaining their contention that the act in question is effectively curative. That was a case arising during the late civil war where a tax for raising a bounty for volunteers was -levied without any authority of law. This tax was subsequently ratified by the legislature, and this curative statute was held valid for that purpose. How much the necessities of war may have influenced this decision it is unnecessary to inquire, and it is sufficient to say that Judge Cooley, in his work on taxation, refers to this case in a note, and speaks of another case immediately following it as “ a more doubtful one.” (Cooley on Taxation, 515, note 1, 3d ed.) The same criticism might be made of the case of Kunkle v. Franklin (13 Minn., 127), where a similar war tax was illegally imposed and subsequently ratified by the legislature, and where doubt as to the soundness of the doctrine is expressed in the opinion itself, for the court in holding the curative statute valid says:
“Although this question is not free from doubt and embarrassment, we think it must be answered in the affirmative. It is true, as said by Mr. Chan.cellor Kent, that a retrospective statute affecting and changing vested rights is very generally considered in this country as founded on unconstitutional principles, and consequently inoperative and void.”
The case of Hamilton v. Dillin (21 Wall., 92) is also relied upon by the counsel for the defendant. With reference to that case it is sufficient to say (1) the tax was held legal with *74 out any validating act, and (2) the tax was also a proper exercise of the military power of the President against an enemy in time of war.
Any number of cases might be further cited where this question is discussed and decided; and in nearly all of them the same rule is kept in view and maintained — i. e., that retrospective statutes relating to defects in tax proceedings are valid only to the extent of curing such defects as are in the nature of irregularities, and can not extend to matters of jurisdiction. We believe there are but few cases where this rule has not been followed; and in those cases the decisions are based upon exceptional circumstances which bring them near to the border line before mentioned.
If a tax can be imposed and collected under an Executive order without any authority whatever of the Congress, where the sole authority for taxation under the Constitution rests, and such illegal act can be afterwards validated by Congress to the extent of refusing redress to parties who have paid this tax under duress, it would seem that there was no limit to retroactive legislation by Congress except such as are provided in express terms by the Constitution.
If the claimants had refused to submit to the imposition of the tax in question, and had taken their merchandise into the Philippine Islands clandestinely, thus evading its payment, it would not be claimed that they could be convicted of the crime of smuggling; indeed, it would not be contended that any duty could be recovered of them by virtue of said validating act of Congress. This being so, we are confronted in this case with the anomaly of the claim that the Congress by said act has imposed a burden upon those who have peacefully submitted to the imposition of an illegal tax, trusting to the courts for redress, which might have been successfully avoided by a disregard and contempt of the military authorities of the Government. A mere statement of this claim appears so shocking to every sense of justice and idea of good citizenship as to need no argument to show its unsoundness.
It is unnecessary to say that at the time the. Executive order in question was issued its provisions were well within the war power of the President, and that all taxes received *75 under it were collected only during such times as it was deemed a proper exercise of such, power. The different views which were entertained upon that subject were set at rest, however, by the decision of the Supreme Court in Lincoln v. United States (supra), and which has given rise to the present litigation.
The demurrer is overruled, with leave to the defendants to further plead as they may be advised at any time within sixty days.