23 C. C. P. A. (Customs)

## PORTO RICO BROKERAGE CO., Inc., et al.
### v. UNITED STATES.

#### Customs Appeal No. 3666.

Court of Customs and Patent Appeals.
April 19, 1935.

GRAHAM, Presiding Judge, and BLAND, Associate Judge, dissenting.

———◆———

James R. Beverley, Jesus A. Gonzalez, and Ryder Patten, all of San Juan, P. R., for appellants.

Joseph R. Jackson, Asst. Atty. Gen. (William H. Futrell, Sp. Atty., of New York City, of counsel), for the United States.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from a judgment of the United States Customs Court.

The cause was originally decided by this court on June 12, 1934. Due to certain legislation subsequently enacted by the Congress, hereinafter set forth and discussed, a petition by the government for a rehearing was granted on October 29, 1934, and the cause was again argued and submitted on December 13, 1934.

Our former decision, 71 F.(2d) 469, 470, 22 C. C. P. A. (Customs) ——, T. D. 47156, contains a full statement of the facts, which, for the purpose of clarity, we deem it advisable to repeat.

Certain coffee brought into the port of San Juan, Porto Rico (now Puerto Rico, 47 Stat. 158, c. 190 [48 USCA § 731a]), from continental United States during the months of February, March, and April, 1931, was assessed for duty by the United States Collector of Customs at that port at 10 cents per pound under and by virtue of the provisions, as construed by him, of Joint Resolution No. 59, adopted by the Legislature of Puerto Rico, *approved by the Governor*

*May 5, 1930,* and section 319 of the Tariff Act of 1930 (19 USCA § 1319)', *enacted June 17 of that year.*

The importers protested, claiming that the merchandise was not subject to duty,' and that the duties assessed by the collector were without authority of law.

The trial court overruled the protests, and the importers appealed to this court.

The appeal involves four protests, which were consolidated for the purpose of the trial in the court below.

On the trial below, counsel for the government moved to dismiss protest 523427–G as to entry 2048, on the ground that the protest was filed more than 60 days after that entry was liquidated by the collector. Counsel for the importers stated that "we have no objection" to the granting of the motion.

It appears from the record that protest 523427–G, supra, involved, in addition to entry 2048, supra, entry 2349, liquidated June 8, 1931. In view of the fact that that protest was filed July 18, 1931, it was timely as to the latter entry. .

The trial court, evidently through inadvertence, dismissed the protest in its entirety, whereas it should have been dismissed as to entry 2048 only.

Appellants included entry 2048 in protest 523427–G in their appeal to this court. Thereafter, on December 23, 1933, the appeal was dismissed by this court, so far as it related to that entry, in accordance with a stipulation entered into by counsel for the parties on December 18, 1933.

The cause was submitted to the court below on a stipulation of facts entered into by counsel for the parties, wherein it appears, among other things, that the Collector of Customs, in accordance with an opinion of the Attorney General of Puerto Rico, did not collect duties under the provisions of Joint Resolution No. 59, "until on and after July 15, 1930," and that the involved merchandise was brought into Puerto Rico from continental United States.

Joint Resolution No. 59, and section 319, supra, read, respectively, as follows:

*"Joint Resolution to Impose an Import Duty on Foreign Coffee Brought Into Porto Rico, and for Other Purposes.*

"Whereas, As a result of the hurricane of September 13, 1928, the coffee industry suffered losses estimated at seventy-five per cent, and one-fourth of the rural population of Porto Rico was reduced to a condition of misery; .

"Whereas, The lands devoted to the cultivation of coffee are, due to their hilly nature, unsuitable for the employment of mechanical means of cultivation, and the enforced use of manual labor increases the cost of production to such an extent that it makes it impossible to compete in price with *other coffee exporting countries;*

"Whereas, The prices now prevailing in the world market are ruinous to such an essentially Porto Rican industry, and, in the absence of tariff protection, the industry would very soon disappear;

"Whereas, An act is now pending approval by the Congress of the United States, which authorizes the Legislature of Porto Rico to impose a duty of ten cents on every pound of *foreign coffee imported into Porto Rico;*

"Now, Therefore, Be it resolved by the Legislature of Porto Rico:

"Section 1. From and after August 1, 1930, an import duty of ten cents a pound is hereby levied on all coffee imported into Porto Rico, such duty to be collected by the Federal Customs Service established in Porto Rico, according to such regulations as said Service may prescribe.

"Section 2. All laws or parts of laws in conflict herewith are hereby repealed.

"Section 3. This Act shall take effect as soon as any act is approved by the United States Government, whereby the Legislature of Porto Rico is authorized to impose an import duty on all coffee brought into this Island." (Italics, except for title, ours.)

"Sec. 319. *Duty on coffee imported into Porto Rico.* The Legislature of Porto Rico is hereby empowered to impose tariff duties upon coffee imported into Porto Rico, including coffee grown in a foreign country coming into Porto Rico from the United States. Such duties shall be collected and accounted for as now provided by law in the case of duties collected in Porto Rico."

In our original decision we stated that, "Although by the Treaty signed at Paris, December 10, 1898, duly ratified, and, thereafter, on April 11, 1899, duly proclaimed (30 Stat. 1754), Puerto Rico was ceded to, and came under the sovereignty of, the United States as a 'dependency or possession,' it has not been incorporated into the United States as an integral part thereof. On the contrary, it has been, and now is, 'gov-

erned under the power existing in the Congress to make laws for such territories.' Downes v. Bidwell, 182 U. S. 244, 21 S. Ct. 770, 45 L. Ed. 1088; Hawaii v. Mankichi, 190 U. S. 197, 23 S. Ct. 787, 47 L. Ed. 1016; Dorr v. United States, 195 U. S. 138, 24 S. Ct. 808, 49 L. Ed. 128, 1 Ann. Cas. 697; Rassmussen v. United States, 197 U. S. 516, 25 S. Ct. 514, 49 L. Ed. 862; New York ex rel. Kopel v. Bingham, 211 U. S. 468, 29 S. Ct. 190, 53 L. Ed. 286; Porto Rico v. Rosaly y Castillo, 227 U. S. 270, 33 S. Ct. 352, 57 L. Ed. 507; People of Porto Rico v. Tapia, 245 U. S. 639, 38 S. Ct. 192, 62 L. Ed. 525"; that by virtue of section 57 of the Organic Act of Puerto Rico (48 USCA § 735), which provides that, " * * * The laws and ordinances of Porto Rico in force on March 2, 1917, shall continue in force and effect, except as altered, amended, or modified in this chapter, until altered, amended, or repealed by the legislative authority herein provided for Porto Rico or by Act of Congress of the United States; and such legislative authority shall have power, when not inconsistent with the provisions of this chapter, by due enactment to amend, alter, modify, or repeal any law or ordinance, civil or criminal, continued in force by this chapter as it may from time to time see fit, * * *" and section 3 of that act (48 USCA § 738), which provides that, " * * * all merchandise and articles *coming into* the United States from Porto Rico and *coming into* Porto Rico from the United States shall be entered at the several ports of entry free of duty and in no event shall any duties be collected on said merchandise or articles * * *" (italics ours), the Legislature of Puerto Rico did not have the power, at the time it adopted the joint resolution, to levy a duty or tax on coffee "coming into" that territory from the United States; and that unless the Congress intended by the provisions of section 319, supra, to validate Joint Resolution No. 59, the involved taxes were illegally assessed.

We called attention to the proposition that, in the construction of statutes, retrospective and retroactive legislation was not favored; that statutes, except those in certain instances, relating to remedies and procedure should be construed, in the absence of language clearly expressing a contrary intention, as having only prospective, rather than retrospective and retroactive, operation, and, in support thereof, cited the following authorities: Brown & Co. et al. v. United States, 12 Cust. App. 93, T. D.

40026, and cases cited; Penick & Ford, Ltd., Inc., v. United States, 12 Cust. App. 218, T. D. 40228, and cases cited; 59 C. J. 1159–1173, §§ 692–700. We stated that it clearly appeared from the text of section 319, supra, and from its legislative history that the Congress was legislating for the future, and that it did not intend that the provisions of that section should operate retroactively either for the purpose of validating Joint Resolution No. 59, or for any other purpose; that as the "Organic Act establishing a civil government for Puerto Rico," which, for all practical purposes, is the Constitution of that territory, prohibited the imposition of customs duties on merchandise brought into Puerto Rico from the United States at the time Joint Resolution No. 59 was adopted. * * * The Joint Resolution was void for want of constitutional power to adopt it, and it was not validated by a subsequent amendment to the Organic Act which did not ratify and confirm it, but merely authorized the enactment of such legislation," and, in support thereof, cited 12 C. J. pp. 727 and 1091, §§ 99 and 787; and that, therefore, the involved duties were unlawfully assessed.

Subsequent to our original decision, the Congress, on June 18, 1934 (19 USCA § 1319a), enacted the following legislation:

"An Act providing for the ratification of Joint Resolution Numbered 59 of the Legislature of Puerto Rico, approved by the Governor May 5, 1930, imposing an import duty on coffee imported into Puerto Rico.

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the taxes and duties imposed by Joint Resolution Numbered 59, enacted by the Legislature of Puerto Rico and approved by the Governor of Puerto Rico May 5, 1930, are legalized and ratified, and the collection of all such taxes and duties made under or by authority of such Joint Resolution of the Puerto Rican Legislature is legalized, ratified, and confirmed as fully to all intents and purposes as if the same had, by prior Act of Congress, been specifically authorized and directed. * * *" (48 Stat. 1017)

—thereby ratifying, confirming, and legalizing the collection of all taxes and duties imposed by and collected under or by authority of Joint Resolution No. 59. Rafferty v. Smith, Bell & Co., 257 U. S. 226, 42 S. Ct. 71, 66 L. Ed. 208.

█ If we understand correctly, the position of counsel for the government is that the joint resolution is sufficiently comprehensive to cover the involved duties; that if it is not, but provides only for the imposition of *import duties* on coffee *imported into Puerto Rico* from *foreign countries,* the Congress, nevertheless, having in mind the previous decision of this court in this case, intended to validate not only the duties collected under and by virtue of the provisions of the joint resolution, but also all duties, including those on coffee "coming into" Puerto Rico from continental United States, such as those here involved, assessed and collected merely under color of the joint resolution; and that such intention is manifest from the ratifying act and its legislative history.

We quote from the brief of counsel for the government: What the Congress actually did by the enactment of the said Bill H. R. 9946 in June, 1934, was to validate not only that part of Section 1 of said Joint Resolution number 59 reading: "an import duty of ten cents a pound is hereby levied on all coffee imported into Puerto Rico," but it also *validated* the *collection of the duties* in question by the Collector of Customs on this identical coffee. In other words the "import duties" in question, which the appellants claim were illegally assessed and collected, have been "legalized, ratified, and confirmed as fully to all intents and purposes as if the same had, by prior act of Congress, been specifically authorized and directed."

We have carefully examined the ratifying act and its legislative history, and have found nothing to indicate that the Congress contemplated anything more than the ratification of the joint resolution and the validation of the collection of duties and taxes assessed in accordance with its provisions.

It is true that, shortly after our decision of June 12, 1934, viz., June 15, 1934, the governor of Puerto Rico addressed a letter to the Secretary of War, wherein he called attention to the decision of this court holding that the joint resolution was void for want of authority to adopt it, and stated that it was necessary, for reasons therein enumerated, "to have the Puerto Rican act ratified," and that he was inclosing a bill to be introduced in the Congress for that purpose. The governor further stated that: "The levy of the tax [referring to the duties imposed by the provisions of the joint resolution] is in accord with the intention of Congress as evidenced by the enactment of section 319 of the Tariff Act of 1930, enacted June 15 of that year, which specifically authorized the Legislature of Puerto Rico to impose tariff duties upon coffee imported into Puerto Rico, including coffee grown in a foreign country and imported into Puerto Rico from the United States." See Congressional Record, vol. 78, part II, p. 11604.

The governor's statement relative to the power conferred upon the Legislature of Puerto Rico by the enactment of section 319, supra, is correct. That section, enacted subsequent to the adoption of the joint resolution, specifically authorized the Legislature of Puerto Rico to levy tariff duties on coffee (obviously from foreign countries) *imported* into Puerto Rico, and, in addition thereto, authorized the imposition of such duties on coffee "grown in a foreign country coming into Porto Rico from the United States." It may be observed at this point, however, that the ratifying act did not relate to the collection of duties or taxes imposed under and by the authority of section 319, supra, but, on the contrary, related solely to duties and taxes imposed and collected under and by the authority of the joint resolution.

At the time this case was originally presented, counsel for appellants urged the view that the involved duties were not within the purview of the joint resolution. That issue was discussed in the decision of the United States Customs Court. Due, however, to the views we held, that is, that the Legislature of Puerto Rico was without power to enact the joint resolution, and the Congress not having ratified it, or the collection of duties assessed under and by virtue of its terms, we deemed it unnecessary to discuss it.

At the time the ratifying act was presented to the House of Representatives, Mr. McDuffie, from the Committee on Insular Affairs, stated: "Mr. Speaker, I ask unanimous consent for the immediate consideration of H. R. 9946, *providing for the ratification of Joint Resolution No. 59 of the Legislature of Puerto Rico,* approved by the Governor May 5, 1930, *imposing an import duty on coffee imported into Puerto Rico,* which I send to the desk and ask to have read." (Italics ours.) In explanation of the purpose of the bill, he said, in substance, that the joint resolution was held invalid by this court because it was adopted prior to the enactment of section 319, supra, and at a time when the Legislature of Puerto

Rico was without authority in the premises. He stated that, unless the joint resolution was ratified by the Congress, "Brazil or other coffee-producing countries can * * * dump its cheap coffee into Puerto Rico and there have it mixed with the better grade of coffee, and destroy the market for one of the basic industries of that island." When asked whether the tax on coffee was an import tax, Mr. McDuffie replied in the affirmative. See Congressional Record, supra, pp. 12155, 12156.

The Committee on Insular Affairs, so far as material here, reported as follows: "The purpose of this bill is to ratify the joint resolution, no. 59, of the Puerto Rican Legislature approved May 5, 1930." (Italics ours.) See Congressional Record, supra, p. 12156.

It is perfectly apparent from the letter of the governor of Puerto Rico, and the discussion in the House of Representatives, with regard to the ratifying act, that the question of whether the joint resolution was sufficiently comprehensive to apply to coffee grown in a foreign country, although a product of the United States, coming into Puerto Rico from continental United States, was not in the minds of any of those who took part in the presentation, consideration, and enactment of the ratifying act. Furthermore, it is evident, we think, from the context of the ratifying act that it was intended to relate only to the joint resolution, and to the taxes and duties collected under and by virtue of the authority of its provisions.

Paraphrasing the language of the Supreme Court, on rehearing, in the case of Lincoln v. United States, 202 U. S. 484, 498, 26 S. Ct. 728, 50 L. Ed. 1117, the ratifying act may, in view of its language and its legislative history, be assumed to apply only to the provisions of the joint resolution, and to the assessment and collection of taxes and duties in pursuance thereof. The act does not construe the joint resolution. Accordingly, the construction to be placed upon the joint resolution, and the question of what action was properly taken by the collector thereunder, is for the court.

It cannot be argued that the ratifying act "was meaningless unless it embraced duties" or taxes collected on coffee grown in a foreign country coming into Puerto Rico from the United States, such as those here involved, because it clearly validated import duties collected on coffee imported into Puerto Rico from foreign countries.

Had the Congress been aware of the issue now under consideration, which, as has been stated, was discussed by the trial court but not by us in our original decision, it might be conjectured, although, of course, a decision cannot be based upon such a premise, that the ratifying act might have been extended to the collection of taxes and duties upon coffee, a product of this country, although grown in a foreign country, coming into Puerto Rico from continental United States.

We are of opinion, therefore, that it was the purpose of the Congress, as evidenced by the ratifying act and its history, to validate the collection of such taxes and duties only as were imposed and collected under and by virtue of the authority of the joint resolution.

Accordingly, the sole issue now before us is whether coffee coming into Puerto Rico from the United States is within the purview of the joint resolution. If it is, the taxes assessed by the collector in the case at bar have been legalized. If it is not, appellants are entitled to restitution.

It appears from the joint resolution that, due to conditions in Puerto Rico and the low prices for coffee prevailing in the world market, it was impossible, in the absence of tariff protection, for those engaged in the coffee industry in that territory "to compete with other coffee exporting countries"; that the Legislature of Puerto Rico was familiar with the provisions of section 319, supra, except possibly a slight change in phraseology not material here, then pending in the Congress; and that section 1 of the joint resolution provides for the levying of an import duty of 10 cents per pound on all coffee imported into Puerto Rico.

It is well settled that the words "imposts," "imports," and "exports," as used in the Constitution, have a "necessary correlation," and relate only to commerce between the United States and foreign countries. Marriott v. Brune et al., 9 How. (50 U. S.) 619, 631, 13 L. Ed. 282; Woodruff v. Parham, 8 Wall. (75 U. S.) 123, 136, 19 L. Ed. 382; Brown v. Houston, 114 U. S. 622, 5 S. Ct. 1091, 29 L. Ed. 257; Pittsburgh & Southern Coal Co. v. Louisiana, 156 U. S. 590, 600, 15 S. Ct. 459, 39 L. Ed. 544; Patapsco Guano Co. v. Board of Agriculture of North Carolina, 171 U. S. 345, 353, 18 S. Ct. 862, 43 L. Ed. 191; Dooley v. United States, 183 U. S. 151, 22 S. Ct. 62, 46 L. Ed. 128; Lawder v. Stone, 187 U. S.

281, 23 S. Ct. 79, 47 L. Ed. 178; Swan & Finch Co. v. United States, 190 U. S. 143, 23 S. Ct. 702, 703, 47 L. Ed. 984; Faber v. United States, 221 U. S. 649, 31 S. Ct. 659, 55 L. Ed. 897; Cunard S. S. Co. v. Mellon, 262 U. S. 100, 121, 122, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306.

In discussing the meaning of the word "export," in the Swan & Finch Co. Case, supra, Mr. Justice Brown stated:

"Whatever primary meaning may be indicated by its derivation, the word 'export,' as used in the Constitution and laws of the United States, generally means the transportation of goods from this to a foreign country. * * *

"True, the context may sometimes give to the word a narrower meaning, and in the execution of the administrative affairs of government it may have been applied to cases in which there was not in the full sense of the term an exportation, yet these are exceptions and do not destroy its general signification. It cannot mean simply a carrying out of the country, for no one would speak of goods shipped by water from San Francisco to San Diego as 'exported,' although in the voyage they are carried out of the country. Nor would the mere fact that there was no purpose of return justify the use of the word 'export.' Coal placed on a steamer in San Francisco to be consumed in propelling that steamer to San Diego would never be so designated. Another country or state as the intended destination of the goods is essential to the idea of exportation."

As stated by Mr. Justice Miller, in the case of Woodruff v. Parham, supra, the terms "export," "import," and "impost" are not used generally "in reference to any other than foreign commerce, without some special form of words to show that foreign commerce is not meant."

It has been uniformly held that *imported merchandise,* except where a statute otherwise provides, see Procter & Gamble Manufacturing Co. v. United States, 19 C. C. P. A. (Customs) 415, 422, T. D. 45578, "is *merchandise* that has been brought within the limits of a port of entry *from a foreign country* with intention to unlade, and the word *'importation'* as used in tariff statutes, unless otherwise limited, means merchandise to which that condition or status has attached." (Italics ours.) United States v. Estate of Boshell, 14 Cust. App. 273, 275, T. D. 41884.

■ Puerto Rico ceased to be a foreign country upon the ratification of the treaty with Spain. De Lima v. Bidwell, 182 U. S. 1, 21 S. Ct. 743, 45 L. Ed. 1041; Dooley v. United States, 182 U. S. 222, 21 S. Ct. 762, 45 L. Ed. 1074; Dooley v. United States, 183 U. S. 151, 22 S. Ct. 62, 46 L. Ed. 128; The Diamond Rings (Fourteen Diamond Rings v. United States), 183 U. S. 176, 22 S. Ct. 59, 46 L. Ed. 138; Faber v. United States, supra; Burnet v. Chicago Portrait Co., 285 U. S. 1, 6, 52 S. Ct. 275, 76 L. Ed. 587. However, due to the fact that it has not been incorporated into the United States, and is not an integral part thereof (although, for tariff purposes, it is included as a part of the United States by sections 401 of the Tariff Acts of 1922 and 1930 [19 USCA §§ 231, 1401]), but is a "dependency or possession," taxes levied on goods coming into that territory from the United States are not repugnant to the "uniformity clause" of the Constitution, clause 1, section 8 of article 1, nor to the mandate that "No Tax or Duty shall be laid on Articles exported from any State." Clause 5, section 9 of article 1. Downes v. Bidwell, supra; Dooley v. United States, 183 U. S. 151, 22 S. Ct. 62, 46 L. Ed. 128; The Diamond Rings (Fourteen Diamond Rings v. United States), supra.

■ It would seem to be clear from the authorities cited that products of the United States coming into Puerto Rico from ports of the United States are not "imports" within the meaning of that term as used in the Constitution. See the concurring opinion of Mr. Justice White in the case of Dooley v. United States, 183 U. S. 151, 164, 22 S. Ct. 62, 46 L. Ed. 128. It is also clear that the Legislature of Puerto Rico has no power, except with the consent of the Congress, to "lay a tax upon goods arriving from ports of the United States," and authority conferred by the Congress on the Legislature of that territory to levy duties upon goods imported into that territory from foreign countries does not extend to products of continental United States coming into that territory from ports of the United States.

In the light of the authorities hereinbefore referred to, we venture to say that no one would seriously contend that an act of the Congress, limited to the imposition of an *import duty* of 10 cents per pound on coffee *imported* into the United States, would have application to Puerto Rican cof-

fee brought into the United States from a port of that territory.

Desiring to give the Legislature of Puerto Rico the power to impose duties or taxes on coffee "grown in a foreign country *coming into Porto Rico from the United States*," in addition to the power to "impose tariff duties upon coffee *imported* into Porto Rico" from foreign countries, the Congress, having in mind, no doubt, the principles hereinbefore stated, as well as the fact that at that very time it was providing in section 401 of the Tariff Act of 1930 (19 USCA § 1401), then pending before it, that, for tariff purposes, Puerto Rico should be included as a part of the United States, was careful to use language in section 319 of that act clearly and expressly conferring such power. (Italics ours.) The Congress undoubtedly used the word "imported," standing alone, as meaning coffee brought into Puerto Rico from foreign countries, and, in order to include coffee brought into Puerto Rico from the United States, it used the words "coming into." Here the Congress clearly distinguished between the words "coming into" and the word "imported." When it referred to foreign commerce, it used the word "imported," and when it referred to products of continental United States, although grown in a foreign country, it used the words "coming into."

The Legislature of Puerto Rico was aware of the fact, when it passed the joint resolution, that section 319, supra, in substantially its present form, was pending before the Congress. Furthermore, it depended upon the enactment of the provisions of that section, or similar legislation, to give validity to the joint resolution. It knew perfectly well that by virtue of the provisions of section 401 of the Tariff Act of 1922, then in force, Puerto Rico was, for tariff purposes, a part of the United States, and presumably was aware that similar provisions, section 401 of the Tariff Act of 1930, maintaining its status in that regard were then pending before the Congress.

Familiar as it was with the facts and principles hereinbefore stated, the Legislature, nevertheless, proceeded to provide in the joint resolution for an *import duty* of 10 cents per pound on all coffee *imported* into Puerto Rico, but failed to provide for the imposition of a duty or tax on coffee "grown in a foreign country coming into" that territory from continental United States. This being true, we must assume that the Legislature of Puerto Rico used the word "imported" in the same sense that it was used by the Congress in section 319, supra; that is, that it had reference to coffee *imported* into Puerto Rico from foreign countries.

Should there be any doubt as to the construction to be placed upon the joint resolution, such doubt must be resolved in favor of the taxpayer. Hartranft v. Wiegmann, 121 U. S. 609, 7 S. Ct. 1240, 30 L. Ed. 1012; American Net & Twine Co. v. Worthington, 141 U. S. 468, 12 S. Ct. 55, 35 L. Ed. 821; Gould v. Gould, 245 U. S. 151, 38 S. Ct. 53, 62 L. Ed. 211; United States v. George Riggs & Co., 203 U. S. 136, 27 S. Ct. 39, 51 L. Ed. 127; United States v. Field, 255 U. S. 257, 41 S. Ct. 256, 65 L. Ed. 617, 18 A. L. R. 1461; Reinecke v. Northern Trust Co., 278 U. S. 339, 49 S. Ct. 123, 73 L. Ed. 410, 66 A. L. R. 397.

In view of the fact that the involved merchandise was not an "import" in the sense of the Constitution and laws of the United States, and in view of the fact that the words "imports," "imposts," and "exports," have a "necessary correlation," and, *except where otherwise expressly provided,* have reference only to foreign commerce, it would seem to be clear that the Legislature of Puerto Rico had no intention, or, if it had, wholly failed to express it in the joint resolution, of levying a tax of 10 cents per pound on coffee brought into that territory from continental United States. Having failed to provide for the imposition of such tax, and as ratification by the Congress is equivalent to prior authority to adopt the joint resolution, and to impose and collect only such duties as are provided for therein, we must hold that the involved duties were unlawfully assessed; that they have not been legalized; and that appellants are entitled to restitution.

For the reasons herein stated, we adhere to the conclusion reached in our original decision. Accordingly, the judgment is reversed, and the cause remanded for proceedings consistent with the views herein expressed.

Reversed and remanded.

GRAHAM, Presiding Judge (dissenting).

I am unable to agree with the conclusion reached by the majority on the rehearing of this case. I shall avoid, as much as possible, a statement of the facts, which have been quite fully and fairly stated in the ma-

jority opinion, except in so far as it may seem necessary to explain my views.

Customs duties were imposed by the collector at San Juan, Puerto Rico, on foreign grown coffee brought into Puerto Rico from the United States, during the months of February, March, and April, 1931, after the enactment of the Tariff Act of 1930, June 17, 1930, 46 Stat. 590. The importer protested against the imposition of the duties, claiming that "all coffee imported into Porto Rico from the United States before May 5, 1931, should be free of duties." The collector justified his action "under section 319 of the Tariff Act of 1930 and Joint Resolution No. 59."

The matter came before this court on appeal, 71 F.(2d) 469, 472, 22 C. C. P. A. (Customs) ——, T. D. 47156. We held that at the time Joint Resolution No. 59 was enacted by the Legislature of Puerto Rico, there was no authority of law for the enactment of the same; that the said Legislature was, in fact, prohibited from enacting the same by the Organic Act of Puerto Rico of March 2, 1917, c. 145, 39 Stat. 951; and that said section 319 of the Tariff Act of 1930 (19 USCA § 1319) was not retroactive, but prospective, in its operation. The question of the constitutional right of the Congress to grant such a right to the Legislature of Puerto Rico was reserved; the court disposing of the matter with this statement:

"* * * Accordingly, the Joint Resolution was void for want of constitutional power to adopt it, and it was not validated by a subsequent amendment to the Organic Act which did not ratify and confirm it, but merely authorized the enactment of such legislation. * * *

"For the reasons herein stated, we are of opinion that the involved duties were unlawfully assessed."

It will be observed that there was, in our opinion in that case, no intimation of the necessity for any particular language of confirmation. The only matter decided was that there was no intent of the Congress expressed in said section 319 to the effect that the section was to be retroactive in its operation. The inference may have been properly deduced by the Congress from what we there said, that if it had been apparent that it was the congressional intent to ratify and confirm the collection of said duties by the collector at San Juan, the duties would have been held to be lawfully collected.

This court handed down its decision on June 12, 1934. Action was taken soon thereafter, in both houses of the Congress, to ratify and confirm the collection of the said duties theretofore collected on coffee, in Puerto Rico. On June 15, 1934, Mr. Tydings of Maryland, Chairman of the Senate Committee first hereinafter mentioned, introduced a bill (S. 3799) providing for ratification, which was referred to the Committee on Territories and Insular Affairs. Cong. Rec. 73rd Cong., 2nd Sess. vol. 78, part II, p. 11604.

Simultaneously, Mr. McDuffie of Alabama, Chairman of the Committee on Insular Affairs, introduced a similar bill in the House of Representatives. This bill was numbered H. R. 9946, and was reported to the House with a favorable report on June 16, 1934. Cong. Rec. 73rd Cong., 2nd Sess. vol. 78, part II, pp. 12155–57. This bill, quoted in the majority opinion, was enacted and became the law on June 18, 1934, 48 Stat. 1017, c. 604 (19 USCA § 1319a). Mr. McDuffie presented the report of his committee, and explained the purpose of the bill. In doing so, he said in part:

"Mr. McDuffie. Mr. Speaker, the act of Congress of 1930, enacted June 15 of that year, provided that the Legislature of Puerto Rico might impose certain tariff duties on coffee. It so happened that the Puerto Rican Legislature passed a resolution, no. 59, about 1 month before the approval of the act of Congress, levying a tariff of 10 cents a pound on coffee. That resolution has been held invalid because Congress, at the time of its passage, had not granted authority to pass it.

"Coffee is one of the basic industries of the islands, probably the second largest, and, as the gentleman knows, we have already loaned so much money in Puerto Rico with a view to its rehabilitation that we hope some day to realize something upon. The Customs Court within the last few days, on the 12th of June, held that because the resolution of the island legislature was passed after the act of Congress, it was thereby invalid. In other words, the legislature of the island, after authority was granted, could impose the duty, but its action was not retroactive, and must have the approval of Congress to be effective. It so happened that they levied the tax prior to the time when it was proper for them to act. The suggestion for this quick emergency action was sent up yesterday, with the request that it have immediate consideration. I am sub-

mitting the letters of the Governor of Puerto Rico, the Honorable Blanton Winship, and the Assistant Secretary of Agriculture which explain and ask for this legislation.

"I will state to the gentleman the reasons why this bill is necessary. Brazil or other coffee-producing countries can now, without this tariff, dump its cheap coffee into Puerto Rico and there have it mixed with the better grade of coffee, and destroy the market for one of the basic industries of that island. * * *

"Mr. Knutson. The gentleman mentioned the tax on coffee. Was that an import tax?

"Mr. McDuffie. It is an import tax. It is simply for the protection of the coffee producers in Puerto Rico who have formed cooperative associations and who might be unable to compete with cheaper coffee.

"Mr. McFadden. Will the gentleman yield?

"Mr. McDuffie. I yield.

"Mr. McFadden. I am heartily in favor of what this bill proposes. I think it is right and proper. Many of the loans that have been made through the Federal Farm Loan system in Puerto Rico have been made to coffee producers. We have been doing all we could to help them develop the coffee industry, and if they have to compete with Brazilian coffee it will destroy the very industry we have been trying to develop.

"Mr. McDuffie. I thank the gentleman for his contribution. He has given you the very meat and purpose of the legislation."

Accompanying the committee's report, Mr. McDuffie presented a letter from Hon. Blanton Winship, governor of Puerto Rico, to the Secretary of War, which is as follows:

"June 15, 1934.

"Hon. George H. Dern, Secretary of War, Washington, D. C.

"Dear Mr. Secretary: I am enclosing herewith a draft of a bill to ratify Joint Resolution No. 59, of the Puerto Rican Legislature, approved May 5, 1930, imposing a 10-cent import duty on coffee imported into Puerto Rico. The enactment of this bill at the present session of Congress as an emergency matter is necessary to protect a vital portion of the administration's program for the rehabilitation of Puerto Rican industries.

"The coffee industry is one of the basic industries of Puerto Rico. The 10-cent tax levied by the joint resolution of 1930, which has heretofore been regularly collected, is necessary to protect the industry, particularly during the present period of recovery from the effects of the hurricane. The levy of the tax is in accord with the intention of Congress as evidenced by the enactment of section 319 of the Tariff Act of 1930, enacted June 15, of that year, which specifically authorized the Legislature of Puerto Rico to impose tariff duties upon coffee imported into Puerto Rico, including coffee grown in a foreign country and imported into Puerto Rico from the United States.

"Unfortunately the Puerto Rican act, Joint Resolution No. 59, was enacted and approved by the Governor on May 5, 1930, a month and 12 days before the approval of the act of Congress, and consequently the United States Court of Customs and Patent Appeals has now held, in a decision handed down within the past few days (June 12, 1934), that the act of the Puerto Rican Legislature is invalid and void because at the time it was passed Congress had not yet given that legislature the power to enact such legislation.

"Therefore it is necessary to have the Puerto Rican act ratified. The bill herewith submitted is drawn to follow substantially the language used in the act of Congress of June 5, 1920 (c. 253, 41 Stat. 1025), ratifying an export tax theretofore attempted to be imposed by the Philippine Legislature. That ratifying act was upheld by the United States Supreme Court in the case of Rafferty v. Smith, Bell & Co. (257 U. S. 226, 232 [42 S. Ct. 71, 66 L. Ed. 208]).

"The vital necessity for this legislation at the present term of the Congress arises especially from the fact that cooperatives have been formed of the coffee raisers through the Farm Credit Administration for the purpose of extending to them the aid necessary to preserve the industry. This could not be extended if the cheap coffee from Brazil were thrown into the country, thus reducing the price of the Puerto Rican product to a point where little of that could be sold except at the depreciated value on which the Farm Credit Administration would not be willing to extend the loan.

"I urgently request that you transmit this to the chairman of the appropriate committees of Congress with the request that the enactment of this legislation be secured at the present session.

"Sincerely yours,
"Blanton Winship,
"Governor of Puerto Rico."

Reports and statements upon the floor, made by the Chairman of the Committee, or other member having a measure in charge, may be considered by the court, when the language of a measure is uncertain or when it is sought to ascertain the environment at the time of consideration of a measure. Likewise, the history of the times has always been considered material and relevant. United States v. Stone & Downer Co. et al., 16 Cust. App. 82, 87, T. D. 42732, and cases therein cited.

The hurricane in Puerto Rico, which led to the legislation here involved, occurred September 13, 1928. The amount of coffee exported from Puerto Rico, which at times had arisen as high as 51,000,000 pounds in a year, at once fell off, until in the fiscal year ending June 30, 1930, the total exports were but 433,901 pounds. 30th Annual Report of the Governor of Porto Rico for the fiscal year ending June 30, 1930, page 24. 71st Cong. 3rd Sess. H. D. No. 545. The same report (page 84), in a "Comparative statement of foreign coffee imported into Porto Rico," gives the number of pounds imported in the fiscal year ending June 30, 1929, as 5,590,569, and during the fiscal year ending June 30, 1930, as 9,832,458. At the same time, the imports of coffee into the island from the United States rose from 4,091,549 pounds during the calendar year 1929, to 11,202,909 pounds in the calendar year of 1930. Monthly Summary of Foreign Commerce of the United States, December, 1930, part II, page 110. These facts are a part of the history of the times, of which we may take judicial notice. The Apollon, 9 Wheat. 362, 372, 6 L. Ed. 111; Holy Trinity Church v. United States, 143 U. S. 457, 463, 12 S. Ct. 511, 36 L. Ed. 226. It thus appears that the major portion of the coffee brought into Puerto Rico during this period came from the United States.

In view of this legislative history and the history of the times, how can there be any doubt concerning the legislative intent as expressed in said ratifying Act of June 18, 1934? The coffee plantations of Puerto Rico had been destroyed and the principal industry of the island was at the mercy of its foreign competitors. It was necessary, according to the congressional view, that the industry be protected by means of an import duty upon foreign coffee. This could not be done by an import duty on coffee brought direct from foreign countries. Coffee, at that time, entered the ports of the United States, not including Puerto Rico, free of duty. Paragraph 1654, Tariff Act of 1930 (19 USCA § 1201 (1654). From the United States it might enter the ports of Puerto Rico free of duty, if not prevented from doing so by said Joint Resolution No. 59, by said paragraph 1654, or section 319 of said Tariff Act of 1930, or later, by said ratifying Act of June 18, 1934. Thus, the protection to be given, and revenue to be provided for Puerto Rico, would not be given or provided if the said Act of June 18, 1934, is to be construed according to the views of the majority of the court herein.

The said ratifying act was expressly enacted to meet our former decision herein, and to make it certain that the duties already collected might be retained for the use of the government in the stricken island. How it can be believed, or even imagined, that the Congress intended only to ratify the duties collected on the coffee brought into the island directly from foreign countries, while the large and preponderating quantities brought from the United States should be admitted free, is beyond my comprehension. However, the opinion of the majority, and this, as I view it, is the ratio decidendi of the majority, states:

"We have carefully examined the ratifying act and its legislative history, and have found nothing to indicate that the Congress contemplated anything more than the ratification of the joint resolution and the validation of the collection of duties and taxes assessed in accordance with its provisions. * * *

"We are of opinion, therefore, that it was the purpose of the Congress, as evidenced by the ratifying act and its history, to validate the collection of such taxes and duties only as were imposed and collected under and by virtue of the authority of the joint resolution."

No other position could be taken which would lead to the conclusion reached by the majority, for, if it be once admitted that the congressional intent was to ratify and confirm all duties collected by him, including those here involved, then the ratifying acts must be so construed. The only way to avoid this is to conclude that such was not the legislative intent.

No principle is more firmly established, especially in customs law, than this: The legislative intent is the lodestar of judicial decisions. United States v. Guth Stern & Co., Inc., 21 C. C. P. A. (Customs) 246, T. D. 46777. Rules of interpretation adopted by the courts are adopted for the purpose

of arriving at such intent. Schwabacher & Co., Inc. v. United States, 22 C. C. P. A. (Customs) ——, T. D. 47484; Universal Mercantile Co. v. United States, 18 C. C. P. A. (Customs) 441, T. D. 44698. Grammatical rules must yield if their application would defeat the purpose of the Congress. Nestle's Food Co., Inc. v. United States, 16 Cust. App. 451, T. D. 43199. The master rule, in the consideration of all statutes, has been to so interpret them as to carry out the legislative intent. Procter & Gamble Mfg. Co. v. United States, 19 C. C. P. A. (Customs) 415, T. D. 45578, certiorari denied, 287 U. S. 629, 53 S. Ct. 82, 77 L. Ed. 546. In the last-cited case we construed the words "foreign country" to mean a place, including the high seas, outside the customs jurisdiction of this country. No stronger statement of the rule can be found than that in Hartranft v. Oliver, 125 U. S. 525, 526, 529, 8 S. Ct. 958, 961, 31 L. Ed. 813, where it is said: " * * * The intent of the legislature is to be followed, even if not strictly within the letter of the statute. * * *"

Again, in Union National Bank v. Matthews, 98 U. S. 621, 25 L. Ed. 188, the Supreme Court observed: " * * * The intent, not the letter, of the statute constitutes the law. * * *"

See, also, Stoeger v. United States, 15 Cust. App. 291, 294, T. D. 42472; United States v. Clay Adams Co., Inc., 20 C. C. P. A. (Customs) 285, 288, T. D. 46078; Holy Trinity Church v. United States, supra; United States v. Stone & Downer Co., 274 U. S. 225, 252, 47 S. Ct. 616, 71 L. Ed. 1013; United States v. Katz, 271 U. S. 354, 357, 46 S. Ct. 513, 70 L. Ed. 986; Five Per Cent Cases, 6 Cust. App. 291, 321, T. D. 35508.

Having arrived at the conclusion that there is no legislative intent shown to the effect that all duties collected on coffee were to be ratified and confirmed, including those here involved, the majority then proceeds to a discussion of the meaning of the term "imported," as it appears in the preamble of the ratifying act and in said Joint Resolution No. 59. Said Joint Resolution No. 59 provides in its preamble that it is the purpose to "Impose an Import Duty on Foreign Coffee Brought Into Porto Rico"; it recites the catastrophe and the necessity of tariff protection; it recites the pending bill which afterward became the Tariff Act of 1930; it then attempted to impose a duty on "all coffee imported into Porto Rico," (section 1); and, in section 3, provided for

an effective date after the Legislature of Puerto Rico was authorized "to impose an import duty on *all coffee brought into this Island.*" (Italics not quoted.)

At the time of the passage of this resolution, the Legislature of Puerto Rico knew and had in mind the meaning of "import" that was being considered by the Congress in section 319 of the pending bill. That section provided and now provides that "the Legislature of Porto Rico is hereby empowered to impose tariff duties upon coffee imported into Porto Rico, *including coffee grown in a foreign country coming into Porto Rico from the United States.*" (Italics not quoted.) The Legislature also had in mind said paragraph 1654 of said bill, which free listed "Coffee, *except coffee imported into Porto Rico* and *upon which a duty is imposed* under the authority of section 319." (Italics not quoted.)

The words appearing in said section 319, "including coffee grown in a foreign country coming into Porto Rico from the United States," are words of inclusion, and broaden and extend the ordinary meaning of the words "imported" or "imports." Microutsicos v. United States, 2 Cust. App. 342, T. D. 32078; United States v. Nightingale, 5 Cust. App. 79, T. D. 34104. Agreeing, as I do, with the idea expressed by the majority, that Congress might lawfully authorize the imposition of such an import duty on goods coming from the United States, it seems apparent that it did so, and, in doing so, gave a new and special meaning to the words "imports" and "imported," in transactions involving shipments of foreign coffee from the United States to Puerto Rico.

Under such circumstances, Joint Resolution No. 59 was enacted. When the ratifying Act of June 18, 1934, was enacted, said paragraph 1654 and section 319 of the Tariff Act of 1930 were the law of the land. To "import," as regards coffee taken into Puerto Rico, included coffee brought from the United States, and, as I view it, was so intended by the Congress.

There is no hard and fast meaning to be attached to the word "import." Such meaning varies, according to its use and the legislative intent. Goods, when in bonded warehouse, although in customs custody, are not imported. Five Per Cent Cases, supra, 321. They are not imported until they have passed into the custody and control of the importer, his agent, or consignee, United States v. Cronkhite Co., 9 Cust. App. 129,

T. D. 37980; the words "import" and "importation" may be used with entirely different meanings, May Co. v. United States, 12 Cust. App. 266, T. D. 40270; they may mean the time of withdrawal for consumption, Casazza & Bro. v. United States, 13 Cust. App. 627, T. D. 41481. The word "import" has various meanings; it may mean to bring goods within the jurisdictional limits of the country, or may be limited to the time such goods enter the commerce of the country. While the word "import" ordinarily means to bring from a foreign country, it may, if the congressional intent indicates this, mean to bring in from a place outside our customs limits. Procter & Gamble Co. v. United States, supra. Goods are not imported until the duties are levied and paid. Board of Trustees, etc., v. United States, 20 C. C. P. A. (Customs) 134, T. D. 45773, affirmed in 287 U. S. 596, 53 S. Ct. 315, 77 L. Ed. 520. "Import" means to bring an article into a country from the outside. Cunard S. S. Co. v. Mellon, 262 U. S. 100, 122, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306.

A statement very relevant to the issues here involved is found in United States v. Field & Co., 14 Cust. App. 406, T. D. 42052. There we said, in part: *"Unless it clearly appears that Congress otherwise* intended, the word 'importation' means the bringing of goods within the jurisdictional limits of the United States with the intention to unlade them."* (Italics not quoted.)

It follows, therefore, that if it does otherwise appear, the meaning will be given which was intended by the Legislature, and that, I take it, should be the conclusion here.

It is said that the collector did not purport to impose the duties here involved, by virtue of or under the authority of said Joint Resolution No. 59, but under said resolution and said section 319 of the Tariff Act of 1930. It is strange logic to me that because the collector claimed to impose a duty under two separate provisions, therefore he did not do it "under or by authority of such Joint Resolution," as expressed in the ratifying act. It is obvious that the collector imposed the duties under the authority of said joint resolution, being of the opinion that the same had been fully legalized by said section 319. As a matter of law, Joint Resolution No. 59, proceeding from the Legislature of Puerto Rico, was the only source of his authority. He could not levy duties under said section 319. This section only authorized the Legislature to act. His authority must come from the Legislature of Puerto Rico.

It follows that the collector acted under and by authority of said Joint Resolution No. 59. It likewise follows that the "collection of all such taxes and duties made by or under" its authority, were "legalized, ratified, and confirmed as fully to all intents and purposes as if the same had, by prior Act of Congress, been specifically authorized and directed." Act of June 18, 1934 (19 USCA § 1319a). This, the Congress clearly had the right to do. United States v. Heinszen & Co., 206 U. S. 370, 390, 27 S. Ct. 742, 51 L. Ed. 1098, 11 Ann. Cas. 688; Rafferty v. Smith, Bell & Co., 257 U. S. 226, 42 S. Ct. 71, 66 L. Ed. 208.

I conclude what I have to say with this brief excerpt from the opinion of the Supreme Court, as expressed by Mr. Justice Woodbury in Marriott v. Brune et al., 9 How. 619, 634, 635, 13 L. Ed. 282:

"* * * Their design is, of course, to protect the revenue from evasions, and the policy of the courts is the same, when deciding how the laws ought to be executed on these subjects.

"But as Congress wishes to foster an honest and honorable commerce by its laws, no less than obtain revenue, it is neither the true policy nor right of Departments or of courts, nor is it presumed to be their desire, to thwart the views of Congress, or embarrass mercantile business, when not attended by equivocation and fraud, or to throw doubts and difficulties over the liberal course proper to be pursued generally towards the community in any branch of trade.

"Thinking, then, as we do, that making this deduction is not only the legal, but the more reasonable and liberal course, it has our full approbation."

I admit it is possible to come to the conclusion reached by the majority. However, in doing so, we must adopt a technical and inflexible construction, which leads us to an unintended and unnecessary result. I incline to a more liberal view which would lead to a conclusion in harmony with the expressed congressional intent, and which is entirely in conformity with well-settled rules of judicial construction. The judgment of the trial court should be affirmed.

BLAND, Associate Judge, concurs in this dissent.